## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DONNA M. GRITTERS; | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| OCWEN LOAN SERVICING, LLC; | ) | File No. 1:14-cv-916 |
| NATIONSTAR MORTGAGE, LLC; | ) | |
| FEDERAL HOME LOAN | ) | JURY TRIAL DEMANDED |
| MORTGAGE CORPORATION; AND | ) | |
| PIERCE & ASSOCIATES, P.C.; | Defendants. | ) |
| | ) | |

## COMPLAINT

Plaintiff, DONNA GRITTERS, by the undersigned attorneys, complains of OCWEN

LOAN SERVICING, LLC, NATIONSTAR MORTGAGE, LLC, FEDERAL HOME LOAN

MORTGAGE CORPORATION, and PIERCE & ASSOCIATES, P.C. as follows:

### NATURE OF THE ACTION

1.  Plaintiff DONNA M. GRITTERS ("Gritters") brings this action for damages from breach

of contract, breach of fiduciary duty, and violations of the Fair Debt Collection Practices Act

("FDCPA"), the Illinois Consumer Fraud Act ("ICFA"), the Real Estate Settlement Procedures

Act ("RESPA"), and the Truth in Lending Act ("TILA").

2.  All of the claims stated herein stem from the wrongful servicing, debt collection, and loss

mitigation activities related to Gritters' mortgage loan.

### JURISDICTION AND VENUE

3.  Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337

as the action arises under the laws of the United States. The Court has supplemental jurisdiction

over state law claims under 28 U.S.C. § 1367. Venue is proper in this District pursuant to 28

U.S.C. § 1391 as Gritters resides in this District and the events occurred in this District.

## PARTIES

4.   Plaintiff Gritters is a natural person who resides at 3018 182nd Place, Lansing, IL 60438 ("subject property"). The subject property is Gritters' primary residence.

5.   Defendant OCWEN LOAN SERVICING, LLC ("Ocwen") is a Florida corporation with its principal place of business in Florida. Ocwen is a foreign company in the business of servicing loans and debt collection across the country, including in the state of Illinois.

6.   Defendant NATIONSTAR MORTGAGE, LLC ("Nationstar") is a Delaware corporation with its principal place of business in Texas. Nationstar is a foreign company in the business of servicing loans and debt collection across the country, including in the state of Illinois.

7.   Defendant FEDERAL HOME LOAN MORTGAGE CORPORATION ("Freddie Mac") is a government-sponsored enterprise with its headquarters in Virginia.  Freddie Mac is the purported creditor/owner of the subject loan.

8.   Defendant PIERCE & ASSOCIATES, P.C. ("Pierce") is a law firm authorized to do business in the state of Illinois. Pierce is in the business of collecting debts from Illinois residents on behalf of third-party creditors, servicers, and debt collectors.

## INTRODUCTION

9.   In 2003, Gritters executed a mortgage loan in the amount of $59,900.00 in favor of Taylor, Bean & Whitaker for the purchase of the subject property. *See* Exhibit A attached hereto is a true copy of the mortgage; *see also* Exhibit B attached hereto is a true copy of the note.

10. Ocwen filed foreclosure against Gritters on February 25, 2010 after a payment default.

11. On April 1, 2010, Gritters obtained a loan modification from Ocwen.

12. Since that date, Gritters has tendered all of the monthly payments as required under the loan modification. Most months Gritters overpaid her mortgage by $25 to $150.

13. After the loan modification, Ocwen continued to treat the loan as if it was in default.

14. Ocwen failed to properly account for Gritters' payments or update its records to reflect the terms of the modification. Ocwen perpetually mishandled Gritters' escrow account, substantially overcharged Gritters for taxes and insurance, and failed to apply or manage the escrow funds in compliance with the provisions of RESPA and the mortgage contract.

15. Moreover, Ocwen failed to notify its foreclosure attorneys that a modification was in effect. Ocwen continued to charge Gritters for foreclosure fees for thirteen additional months.

16. Nationstar purchased the servicing rights from Ocwen in May 2013. Nationstar continued to treat the loan as if it was in default and continued to mishandle Gritters' escrow account.

17. Gritters made countless "Fair Debt Disputes" and sent numerous "Qualified Written Requests" to both Ocwen and Nationstar. Ocwen and Nationstar justified their conduct without any good faith basis and without conducting a reasonable investigation.

18. On October 25, 2013, Pierce sent Gritters a letter stating that it had been hired by Nationstar to commence foreclosure proceedings. On November 11, 2013, Gritters sent a letter to Pierce disputing the validity of the debt and denying the default. Pierce did not verify the debt before filing a second foreclosure against Gritters on January 22, 2014.

## FACTS SUPPORTING CAUSE OF ACTION

19. The subject loan required that Gritters make monthly payments of principal, interest, and escrow for taxes and insurance. *See* Exhibit A at ¶ 2.

20. Any payments were to be allocated (a) first to pay interest due, (b) second to pay principal due, (c) third to fund the escrow account, (d) and fourth to pay any other amounts due, with any remaining amounts to reduce the principal balance. *Id.* at ¶¶ 2-3.

21. Gritters' mortgage stated that funds in the escrow account (taxes and insurance) were not to exceed the amount allowed under RESPA (the "1/6th cushion"). *Id.* at ¶ 3.

22. Any surplus in Gritters' escrow account at the end of the escrow year was to be refunded or applied in accordance with RESPA. *Id.*

### a. The First Foreclosure Case & Loan Modification

23. Gritters defaulted on her monthly payment obligations in June 2009.

24. On August 13, 2009, Ocwen acquired the servicing rights for the subject loan.

25. On February 25, 2010, Ocwen filed a foreclosure action against Gritters.

26. In March 2010, Gritters received a loan modification offer from Ocwen as the servicer on behalf of the owner of the loan.

27. Ocwen represented to Gritters over the phone that the foreclosure action would be dismissed upon receipt of the signed modification and the initial payment. Ocwen also represented that her loan would be current and no additional fees would be owed.

28. On March 20, 2010, Gritters accepted the loan modification by signing the agreement and sending a copy to Ocwen. *See* Exhibit C attached hereto is a true copy of the loan modification.

29. The terms of the loan modification were as follows:

    i.    New Principal Balance of $62,691.34;

    ii.    Initial Payment of $650.26 due on 4/1/10;

    iii.    New Monthly Payments of $624.26 beginning on 5/1/10;

    iv.    5.0% fixed interest rate; and

    v.    40 year loan, maturity date: 3/1/50. *Id.*

30. The monthly payments of $624.26 were comprised of $302.30 for principal and interest, and $321.96 for escrow (taxes and insurance).

31. The loan modification increased Gritters' principal balance to $62,691.34 by adding nine payments of approximately $700.00 and an "escrow adjustment" of $1,014.26. These added payments and fees brought Gritters' loan and escrow account current. *Id*.

32. The loan modification stated:

> "You agree that the new principal balance due under your modified Note and the Mortgage will be $62,691.34. *Upon modification, your Note will become contractually current*; however fees and charges that were not included in this principal balance will be your responsibility."

> *Id.* at ¶ 1. (Emphasis added.)

33. The loan modification did not list any outstanding or accrued fees and costs. Gritters was advised that she did not owe additional fees and charges.

34. Gritters relied on the representation that her loan was current when she accepted the loan modification. Gritters relied on the representation that the foreclosure case would be dismissed.

35. Gritters made her first payment of $650.26 on March 29, 2010; the loan was modified.

36. Although the first loan modification payment was made timely, Ocwen incorrectly imputed the first payment into its computer system as being made on April 27, 2010 and imputed the effective date of the loan modification into its computer system as April 27, 2010.

37. In the intervening period between April 1, 2010 and April 27, 2010, Ocwen assessed hundreds of dollars in unearned fees and costs.

38. When Ocwen applied Gritters' payments on April 27, 2010, it deducted amounts for unearned fees and costs before applying her payments to principal, interest, and escrow.

39. Ocwen continued to treat the loan as if it was in default by applying Gritters' payments to pre-modification charges, including taxes, insurance, foreclosure fees, and costs.

40. Without sending notice to Gritters, Ocwen assessed penalties, increased Gritters' monthly payment amount, and recorded her loan as past due.

### b. Escrow April 2010 through March 2011

41. Ocwen failed to adjust Gritters' escrow account at the onset of her loan modification. Instead, Ocwen artificially increased the actual amounts owed for fees, taxes, and insurance.

42. Pursuant to the loan modification, Gritters' escrow account was fully funded and contractually current on April 1, 2010. *Id.*

43. On April 1, 2010, Gritters' escrow account had a balance of $1,571.77.[1]

44. From April 2010 to March 2011, Gritters' payments to Ocwen totaled $8,006.50. Of the $8,006.50, a total of $3,627.60 was allocated to principal and interest ($302.30 x 12 months).

45. Per the mortgage contract, the remaining $4,378.90 ($8,006.50 - $3,627.60) should have been allocated to escrow. *See* Exhibit A at ¶¶ 2-3.

46. In addition to the beginning balance of $1,571.77, the total amount allocated to escrow from April 2010 to March 2011 should have been $5,950.67 ($1,571.77 + $4,378.90).

47. Between April 2010 and March 2011, Gritters owed a total of $3,272.07 for real estate taxes and a total of $978.00 for insurance. The total amount actually paid from Gritters' escrow account for taxes and insurance was $4,250.07 ($3,272.07 + $978.00).[2]

48. Therefore, as of March 2011, Gritters' escrow account should have had a positive escrow balance of $1,700.70 ($5,950.67 - $4,250.07).

49. However, on March 3, 2011, Ocwen sent Gritters a notice that Ocwen had paid *$4,550.09* for her property taxes and $*1,851.00* for hazard insurance. In total, Ocwen claimed to have paid *$6,401.09* ($4,550.09 + $1,851.00) for taxes and insurance from Gritters' escrow account.

---

[1] Based on Ocwen's own Annual Escrow Account Disclosure Statement.

[2] The second installment of real estate taxes for 2009 was for $1,559.58 and due by December 13, 2010. The first installment of real estate taxes for 2010 was for $1,712.49 and due by April 1, 2011.

6

50. These numbers were artificially inflated and grossly inaccurate.[3]

51. The above notice misrepresented the actual amounts paid, and inflated Gritters' true obligations for taxes and insurance by over $2,000.00 for this time period. As a result of the inflated numbers, Ocwen assessed an escrow "shortage" of $397.15 in March 2011.

52. Ocwen attempted to charge Gritters for the $397.15 escrow "shortage" the following year by increasing her monthly payment by $33.10 over the next 12 months ($397.15 / 12 months).

53. In reality, Gritters never had an escrow "shortage" and was not in default; the amounts paid were sufficient to cover all principal, interest, and escrow (taxes and insurance).

54. Ocwen's improper accounting forced Gritters into a perpetual state of "default."

55. In March 2011, Gritters should have had an escrow balance of $1,700.70. Ocwen never returned or applied the $1,700.70 surplus in accordance with RESPA. This amount was well above the 1/6th annual escrow cushion allowable under RESPA. Ocwen continued to send Gritters statements that she owed additional amounts for escrow and that she was in default.

### c. The Foreclosure Case and Gritters' "Reinstatement"

56. In April 2011, Gritters saw that her home was listed "in foreclosure" on real estate websites. She had been told that the foreclosure case was dismissed one year prior.

57. On April 12, 2011, Ocwen sent Gritters a notice with "reinstatement" figures. The notice claimed that Gritters owed a total of $386.92 to cure a purported default. The reinstatement figures *included* the monthly payment due for April 2011.[4]

---

[3] Ocwen's own payment history confirmed that a total of $1,559.58 was paid for real estate taxes in December 2010 and $1,712.49 was paid for real estate taxes in March 2011. The payment history also confirmed that $978.00 in total was paid for insurance in January 2011.

[4] On April 2, 2011, Ocwen also sent a correspondence claiming $1,410.02 was due. On April 6, 2011, Ocwen sent a correspondence claiming $1,239.91 was due.

58. Since April's monthly payment was approximately $650.00, a reinstatement amount of $386.92 confirmed that Gritters had overpaid her mortgage to date.[5]

59. Gritters paid the $386.92 to Ocwen on April 16, 2011.

60. On April 27, 2011, Ocwen sent a letter admitting that Gritters was current. On May 6, 2011, Ocwen dismissed the foreclosure action, thirteen months after the loan modification.

61. Ocwen continued to charge Gritters for "foreclosure fees" and deducted those amounts from Gritters' monthly payments and escrow account. Ocwen continued to send notices stating that Gritters was in default and that her escrow account was underfunded.

### d. Escrow April 2011 through March 2012

62. On April 1, 2011, Gritters' escrow account should have had a balance of $1,700.70.

63. From April 1, 2011 through March 2012, Gritters made monthly payments to Ocwen that totaled $7,321.74. Of the $7,321.74, a total of $3,627.60 was allocated to principal and interest ($302.30 x 12 months).

64. The remaining $3,694.14 ($7,321.74 - $3,627.60) should have been allocated to escrow.

65. In addition to the beginning balance of $1,700.70, the total amount allocated to escrow from April 2011 to March 2012 should have been $5,394.84 ($1,700.70 + $3,694.14).

66. Between April 2011 and March 2012, Gritters owed a total of $3,689.94 for real estate taxes and a total of $1,058.97 for insurance.[6]

67. The total amount actually paid from Gritters' escrow account for taxes and insurance from April 2011 to March 2012 was $4,748.91 ($3,689.94 + $1,058.97).

---

[5] Reinstatement by definition is a one-time payment to catch up on *all* the arrearages to make a loan current. By admitting that the total amount due in April 2011 was less than the scheduled April 2011 payment, Gritters was not actually behind on their loan.

[6] The second installment of real estate taxes for 2010 was for $1,772.95 and due by November 1, 2011. The first installment of real estate taxes for 2012 was for $1,916.99 and due by March 1, 2012.

68. Therefore, as of April 2012, Gritters' escrow account should have had a positive escrow balance of $645.93 ($5,394.84 - $4,748.91).[7] However, Ocwen assessed an escrow "shortage" against Gritters in the amount of $767.40, notwithstanding the positive balance.

69. Ocwen attempted to charge Gritters for the $767.40 escrow "shortage" the following year by increasing her monthly payment by $63.95 over the next 12 months ($767.40 / 12 months).

70. In reality, Gritters never had an escrow shortage and was not in default; the amounts paid were sufficient to cover all principal, interest, and payments to escrow (taxes and insurance).

71. Ocwen never returned or applied the $645.93 surplus in accordance with RESPA.

72. Ocwen continued to send Gritters correspondence suggesting that she owed additional amounts for escrow and stating that she was in default.

### e. Escrow April 2012 to March 2013

73. Freddie Mac obtained ownership of the subject mortgage loan in April 2012.

74. On April 1, 2012, Gritters' escrow account should have had a balance of $645.93.

75. From April 1, 2012 to March 2013, Gritters' payments to Ocwen totaled $8,360.88. Of the $8,360.88, a total of $3,627.60 was allocated to principal and interest ($302.30 x 12 months).

76. The remaining $4,733.28 ($8,360.88 - $3,627.60) should have been allocated to escrow.

77. Including the beginning balance of $645.93, the total amount allocated to escrow from April 2012 to March 2013 should have been $5,379.21 ($645.93 + $4,733.28).

78. Between April 2012 and March 2013, Gritters owed a total of $3,083.03 for real estate taxes and a total of $1,207.11 for insurance.[8]

---

[7] Ocwen's own payment history confirmed that a total of $1,772.95 was paid for real estate taxes in December 2011 and $1,916.99 was paid for real estate taxes in February 2012. The payment history also confirmed that a total of $1,058.97 was paid for insurance in January 2012.

[8] The second installment of real estate taxes for 2011 was for $1,308.83 and due by August 1, 2012. The first installment of real estate taxes for 2012 was for $1,774.20 and due by March 1, 2013.

79. The total amount actually paid from Gritters' escrow account for taxes and insurance from April 2012 to March 2013 was $4,290.14 ($3,083.03 + $1,207.11).[9]

80. Therefore, as of March 2013, Gritters' escrow account should have had a positive escrow balance of $1,089.07 ($5,379.21 - $4,290.14).

81. Ocwen never returned or applied the $1,089.07 surplus in accordance with RESPA or the mortgage contract. The amount was above the 1/6th cushion allowable under RESPA.

82. Instead, Ocwen continued to send Gritters statements suggesting that she owed additional amounts for escrow and stating that she was in default.

### f. April 2013 to Present and Transfer of Servicing to Nationstar

83. On May 16, 2013, Nationstar purchased the servicing rights from Ocwen.

84. Nationstar made its initial communication with Gritters on May 31, 2013.

85. On June 5, 2013, Nationstar sent Gritters a correspondence claiming that Gritters was in default for five (5) missed monthly payments and owed a total of $4,134.23. In short, Nationstar continued Ocwen's practices of collecting illegal charges, fees, and costs.

86. On approximately June 10, 2013, Gritters phoned Nationstar to dispute the debt. Nationstar spoke with Gritters and acknowledged her dispute.

87. Gritters was current and had continued to make her monthly payment to Nationstar each month in the amount of $760.08 to $788.64. On the date that Nationstar obtained servicing rights, Gritters should have had an escrow balance of $1,089.07.[10]

---

[9] Ocwen's own payment history confirmed that a total of $1,308.83 was paid for real estate taxes in July 2012 and $1,774.20 was paid for real estate taxes in February 2013. The payment history also confirmed that $1,207.11 in total was paid for insurance in January 2012.

[10] Beginning in August 2013, Nationstar began rejecting Gritters monthly payments. Through the date of this complaint, Gritters has continued to tender her payment each month to Nationstar.

88. Notwithstanding the dispute, Nationstar continued to collect the debt and began charging Gritters $486.34 for escrow each month ($5,826.08 annually). This was more than the 1/6th cushion allowed under RESPA or the amount necessary to pay annual taxes and insurance.

### g. QWRs to Ocwen and Nationstar

89. Beginning in April 2011 through September 2013, Gritters sent numerous RESPA Qualified Written Requests ("QWR") to Ocwen. Some of the QWRs were sent by Gritters and some were sent by the Illinois Attorney General on her behalf. Ocwen responded to each QWR by claiming that it had investigated her account and verified its own accounting as accurate.

90. Ocwen did not investigate anything in response to the QWRs. Ocwen did not address (a) its mismanagement of the escrow; (b) reasons for the monthly payment increases or the escrow "shortages;" (c) the overcharging of taxes and insurance; (d) the assessment of pre-modification charges to post-modification statements; (e) withholding escrow funds in excess of the 1/6th cushion; or (f) the assessment of "foreclosure charges" one year *after* the modification.

91. Instead, Ocwen advised Gritters to contact a "certified accountant" if she had "difficulty understanding" the servicing of her mortgage by Ocwen.

92. On September 3, 2013, Gritters sent a QWR to Nationstar disputing the servicing of her loan, assessment of fees, and the amount that Nationstar claimed in arrears.

93. On September 23, 2013, Nationstar responded to the QWR and stated that:

   a.   Gritters' loan had been modified in April 2010;
   b.   At the time of the servicing transfer (5/16/13) the account was due for the February 1, 2013 monthly installment;
   c.   The payment Nationstar received on July 5, 2013 was applied to March 1, 2013;
   d.   Gritters' August 2013 payment was returned to her;
   e.   On August 1, 2013, Nationstar accelerated the loan;
   f.   The account was referred to foreclosure on September 9, 2013;
   g.   Gritters' loan is contractually due for April 1, 2013; and
   h.   Freddie Mac was the owner/creditor of the subject loan.

94. In reality, Nationstar did not investigate anything in response to the QWR. Nationstar merely attached a very basic payment history to its response without explanation.

95. Nationstar did not address its mismanagement of escrow, reasons for the monthly payment increases, the escrow "shortages," the overcharging of taxes and insurance, or the assessment of pre-modification charges to post-modification statements.

96. Instead, the payment history established that Nationstar assessed $272.16 in late charges and $*227.50 for 22 property inspection fees on a single day.*

97. Ocwen and Nationstar reported Gritters' account in default to credit bureaus during the 60 days following each QWR and during the FDCPA dispute period. Gritters has since applied for and been denied credit due to the status of the subject loan on her credit report.

CAUSES OF ACTION

98. Gritters has a valid and enforceable mortgage contract with (a) Freddie Mac as the creditor/owner of the subject loan, (b) Ocwen because the loan modification was executed between Ocwen and Gritters, and (c) Nationstar as the assignee of Ocwen (Ocwen and Nationstar collectively referred to as the "Servicers").

99. The Servicers are agents of Freddie Mac, and Freddie Mac is the principal of the Servicers. Therefore, Freddie Mac is liable for the acts and causes of action against the Servicers.

100. As a proximate cause of all the claims below, Gritters has suffered damages of illegal fees, charges, interest, negative credit reporting, being denied credit, remaining in a perpetual state of "default," emotional distress, loss of time, and the loss of the misapplied payments.

101. Gritters restates each and every allegation set forth in this complaint as if fully alleged in each count of this complaint.

### COUNT I – BREACH OF CONTRACT
### (AGAINST OCWEN, NATIONSTAR, AND FREDDIE MAC)

102.  Gritters fully performed her duties under the contract by tendering all monthly payments to the Servicers, and by complying with all of the other terms of the contract.

103.  The  mortgage contract sets forth, "[i]f there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA." *See* Exhibit A at ¶ 3.

104.  The Servicers unlawfully charged and maintained deposits in Gritters' escrow account above the limits allowed by Gritters' mortgage contract or the 1/6th cushion under RESPA.

105.  The Servicers and Freddie Mac are in further material breach of contract for their:

    a.   failure to accept Gritters' mortgage payments;

    b.   failure to credit and apply Gritters' payments as required by the contract;

    c.   assessment of unauthorized late fees, legal fees, costs, & property inspection fees;

    d.   failure to apply payments to interest and principal before escrow and fees;

    e.   failure to dismiss the foreclosure action for thirteen months;

    f.   filing of a second wrongful foreclosure;

    g.   failure to provide accurate repayment and reinstatement figures;

    h.   failure to accurately respond to Gritters' correspondence and other disputes;

    i.   overcharging Gritters' escrow account for taxes and insurance;

    j.   increasing monthly payments without notification to Gritters;

    k.   placing the loan in default and negatively reporting Gritters to credit bureaus;

    l.   converting escrow funds to unauthorized fees and costs; and

    m.   failure to conduct its affairs in good faith.

WHEREFORE, Plaintiff DONNA GRITTERS respectfully requests that this Honorable Court to:

    a.   find that Ocwen, Nationstar, and Freddie Mac materially breached the mortgage contract;

    b.   award Gritters her actual damages to be proven at trial;

    c.   award Gritters her reasonable attorney fees and costs; and

    d.   award Gritters any other relief this Honorable Court deems equitable and just.

### COUNT II – VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
### (AGAINST OCWEN, NATIONSTAR, AND FREDDIE MAC)

106.  Gritters is a "consumer" as defined by FDCPA § 1692a(3).

107.  The subject debt and the unauthorized fees and costs qualify as a "debts" as defined by FDCPA § 1692a(5) as they arise out of a transaction for personal, family, or household purposes.

108.  Freddie Mac and the Servicers qualify as "debt collectors" as defined by § 1692a(6) because they regularly collect debts and use the mail and/or the telephone to collect delinquent consumer accounts. The Servicers and Freddie Mac qualify as "debt collectors" because they treated the subject debt like it was in default when each acquired rights to the subject debt.

#### a.  Violation of  § 1692d

109.  The Servicers engaged in abusive and oppressive conduct through (i) perpetual unethical mismanagement of the escrow account; (ii) perpetual refusal to refusal to correct their accounting errors or adequately respond to Gritters' repeated disputes over several years; (iii) refusal to acknowledge the express terms of  the loan modification; (iv) perpetual misapplication and rejection of payments; (v) assessment of illegal fees; and (iv) a wrongful foreclosure.

#### b.  Violation of §§ 1692e & f

110.  The Servicers' actions were unfair, unconscionable, false and deceptive as a result of their (i) misrepresentations of the status of the debt;  (ii) attempts to collect illegal fees and costs not authorized by law or the contract; (iii) misrepresentations of the amounts owed for escrow; (iv) declaring the loan in delinquent or default status when the loan modification was in effect; (v) threatening foreclosure, (vi) filing a wrongful foreclosure, (vii) assessing illegal foreclosure fees; and (vii) assessing escrow overdraft charges and improper corporate advances, fees, and costs in their dunning letters, acceleration notices, restatement letters, and payoff letters.

14

111.  The Servicers violated § 1692e(8) by reporting false information and by reporting the loan delinquent to credit bureaus after Gritters disputed the debt and before any validation.

112.  The Servicers misrepresented the debt by lumping their attorney fees, unauthorized fees, and costs in with the principal debt obligation.

### c.  Violation of § 1692g(a)

113.  In all correspondences and written demands for payment, the Servicers misstated the amount of the debt and misled Gritters as an unsophisticated consumer.

114.  The Servicers failed to send a proper validation notice after the initial communication with Gritters.

### d.  Violation of § 1692g(b)

115.  After the initial communication with Nationstar on May 31, 2013, Gritters disputed the debt on June 10,  2010, triggering Nationstar's duty to verify the debt or cease collection actions.

116.  After acknowledging Gritters' debt dispute, Nationstar failed to verify the debt or cease collection activities. Nationstar continued collection efforts after receiving Gritters' dispute in violation of § 1692g. Nationstar has continued to report the debt in default to the credit bureaus without verifying the debt.

WHEREFORE, Plaintiff DONNA GRITTERS requests that this Honorable Court:

a.  enter judgment in her favor and against Ocwen, Nationstar, and Freddie Mac;

b.  declare that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

c.  award Gritters statutory and actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

d.  order the deletion of all adverse credit reporting related to the loan;

e.  award Gritters costs and reasonable attorney fees as provided under 15 U.S.C. §1692k; and

f.  award any other relief as this Honorable Court deems just and appropriate.

### COUNT III– VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
### (AGAINST PIERCE)

117.  Pierce qualifies as a "debt collector" under FDCPA §§ 1692a(6) and 1692e(2)(A).

118.  Pierce is a "debt collector" as defined by § 1692a(6) because it regularly uses the mails and/or the telephone to collect, or attempt to collect, delinquent consumer accounts.

119.  Pierce is a "debt collector" in relation to the subject debt because it treated the debt like it was in default when it acquired rights to the subject debt. *Id.*

####    a.    Violation of § 1692g(b)

120.  After receipt of Pierce's initial communication on October 25, 2013, Gritters disputed the validity of the debt in writing on November 11, 2013, triggering Pierce's duty to verify the debt under § 1692g or cease collection actions until it verified the debt.

121.  Pierce failed to verify the debt or cease all collection activities after receipt of Gritters' debt dispute Letter. Instead, Pierce proceeded to file for foreclosure on January 22, 2014 and report the foreclosure to credit bureaus during the dispute period.

122.  Pierce assessed charges against Gritters for illegal foreclosure fees after the November 11, 2013 debt dispute was made and without providing any verification of the debt.

WHEREFORE, Plaintiff DONNA GRITTERS requests that this Honorable Court:

   a.  enter judgment in her favor and against Pierce;

   b.  declare that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

   c.  award Gritters statutory and actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

   d.  order the deletion of all adverse credit reporting related to the loan;

   e.  award Gritters costs and reasonable attorney fees as provided under 15 U.S.C. §1692k; and

   f.  award any other relief as this Honorable Court deems just and appropriate.

### COUNT IV – VIOLATION OF ILLINOIS CONSUMER FRAUD ACT
### (AGAINST OCWEN, NATIONSTAR, AND FREDDIE MAC)

123.  Gritters meets the ICFA definition of "consumer." *See* 810 ILCS 505/1.

124.  The Servicers violated 815 ILCS 505/2 by engaging in unfair and deceptive acts, and by using fraud, deception, and misrepresentation in their attempts to collect a debt.

#### a. Unfairness

125.  The Servicers' conduct in relation to Gritters' loan was willful, malicious, unfair, arbitrary, and designed to place Gritters' account in a perpetual state of default.

126.  The Servicers' conduct offends public policy as it demonstrated an industry-wide practice of charging unearned fees and costs to a borrower in order to make a profit, and to deceive borrowers into paying more than what is owed.

127.  The Servicers' actions are immoral because overcharging Gritters for unearned fees, overcharging Gritters' escrow without providing a refund, and filing a wrongful foreclosure amounts to an undue hardship to the borrower and an equally undue profit for the Servicers.

128.  The Servicers' actions caused substantial injury to Gritters and to consumers generally, as Gritters and consumers reasonably expect their contracts to be honored and their loans and escrow accounts to be properly managed and their payments properly applied.

129.  Gritters could not avoid these immoral undertakings because the Servicers would not accurately communicate with her in response to her phone calls, letters, and other objections.

130.  When taken as a whole over several years, the Servicers' conduct was so unethical and unending, that Gritters had no choice but to submit.

#### b. Deception

131.  The Servicers' following actions were deceptive: (i) attempting to collect upon and foreclose upon a debt that was not in default; (ii) sending disclosures, statements, and notices

that included unauthorized or unearned costs and fees; (iii) making material misrepresentations of fact regarding the status of the subject loan, the payment history, and the amounts actually owed for taxes and insurance; (iv) overcharging Gritters' escrow for taxes and insurance; (v) providing conflicting disclosures to Gritters; and (vi) employing communications with Gritters that were confusing and specifically designed to confuse Gritters so that she could not decipher the true status of her loan account.

### c. Misrepresentation

132. In addition to the above conduct, the Servicers misrepresented the amounts due so Gritters could not understand why her payments were insufficient to bring the loan "current."

133. Gritters relied on the amounts that the Servicers stated that she owed to her detriment. Gritters relied on the terms of the loan modification and representations that the foreclosure would be dismissed.

134. The Servicers misrepresented the effective date of the loan modification as April 27, 2010 as opposed to April 1, 2010, and misrepresented the date of Gritters' first payment.

135. The Servicers made material misrepresentations regarding the amounts due under the loan, amounts due for escrow, and how Gritters' payments were applied.

136. Due to the misrepresentations, Gritters was unable to determine why her payments were "insufficient" to bring the loan "current" or why she was required to overpay her escrow account.

137. The misrepresentations, deception, and unfair practices complained of occurred in the course of conduct involving trade or commerce. Gritters relied on the misrepresentations, deception, and unfair practices to her own detriment.

138. Punitive damages are warranted because the Servicers' conduct was outrageous, willful, wanton, and showed reckless disregard for the rights of Gritters and consumers in general.

18

WHEREFORE, Plaintiff DONNA GRITTERS requests that this Honorable Court:

a.  enter judgment in her favor and against Ocwen, Nationstar, and Freddie Mac;

b.  declare that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

c.  award Gritters statutory, actual, and punitive damages, in an amount to be determined at trial, for the underlying ICFA violations;

d.  order the deletion of all adverse credit reporting related to the loan;

e.  award Gritters costs and reasonable attorney fees as provided under 815 ILCS 505/10a(c); and

f.  award any other relief as this Honorable Court deems just and appropriate.

### COUNT V – VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT (AGAINST OCWEN AND NATIONSTAR)

139.  The subject loan is a "federally related mortgage" under RESPA. *See* Exhibit A.

140.  The Servicers each qualify as a "servicer" under RESPA § 2605(i)(2).

141.  While servicing the subject loan, the Servicers charged Gritters improper fees, costs, and charges not legally due under the mortgage contract or applicable law.

142.  The Servicers violated RESPA by requiring Gritters to make excessive escrow payments not based on reasonably estimated expenditures or publically available data, tax bills, or insurance bills for the subject property.

143.  The Servicers failed to timely acknowledge receipt of, respond to, or conduct a reasonable investigation in response to Gritters' QWRs or requests for information and disputes regarding servicing in violation of RESPA § 2605(e).

144.  The Servicers violated RESPA § 2605(e)(3) by failing to acknowledge receipt of Gritters' letters disputing the application of payments, the assessment of illegal fees, and the handling of the escrow account.

145.  The Servicers violated RESPA by reporting Gritters as delinquent to credit bureaus within sixty days of receiving a letter disputing the servicing.

146. The Servicers violated RESPA by failing to correct Gritters' account within sixty days of receiving a letter disputing the servicing in violation of RESPA § 2605(e)(2)(A).

### a. Escrow, Taxes, and Insurance

147. The Servicers violated RESPA by

  i. demanding escrow payments that significantly exceeded the actual amount required for insurance and taxes;

  ii. overcharging Gritters for taxes and insurance;

  iii. assessing fees against Gritters without conducting a complete and accurate annual escrow analysis or providing prior notice (12 U.S.C. § 2609(b));

  iv. deducting amounts from Gritters' account for unrelated fees and costs;

  v. implementing an "escrow shortage or deficiency" without providing notice or producing documentation to substantiate the shortage prior to collection;

  vi. failing to send notice of the escrow increase or conduct an accurate annual escrow analysis before imposing fees to Gritters' escrow account;

  vii. failing to provide any notice of the escrow shortage until *after* it had charged the amount to Gritters' account and deducted it from the escrow;

  viii. demanding, assessing, charging, and funding Gritters' escrow account with more than the 1/6th cushion allowed under RESPA § 2609(2);

  ix. failing to refund a escrow surplus over $50; and

  x. failing to correct the wrongful escrow increase, charge, or deductions for taxes and insurance in accordance with RESPA.


WHEREFORE, Plaintiff DONNA GRITTERS requests that this Honorable Court:

  a. grant judgment in her favor and against Ocwen and Nationstar;

  b. declare Ocwen and Nationstar's perpetual conduct to be a violation of RESPA;

  c. award Gritters actual and additional damages pursuant to RESPA § 2605;

  d. award Gritters reasonable attorney fees and costs pursuant to RESPA § 2605(f); and

  e. award any other relief this Honorable Court deems equitable and just.

### COUNT VI – BREACH OF FIDUCIARY DUTY
### (AGAINST OCWEN, NATIONSTAR, AND FREDDIE MAC)

148.  A fiduciary relationship existed between the Servicers and Gritters with respect to management of Gritters' escrow account.

149.  The Servicers (and therefore Freddie Mac) owed a fiduciary duty to Gritters because they were placed in a position of trust while managing Gritters' escrow account.

150.  The Servicers had a duty under the mortgage with respect to the escrow account to apply the amounts held in escrow for proper purposes only.

151.  The Servicers breached their duty by (a) using escrow funds to pay unearned fees and costs and to overpay taxes and insurance; (b) misleading Gritters as to the amount of insurance and taxes owed; (c) debiting illegal amounts from the escrow account without authorization; and (d) profiting from undisclosed fees and costs and overpayment of taxes and insurance.

152.  The Servicers and the Creditor failed to manage the escrow account in good faith when they (a) failed to properly account for timely payments; (b) failed to provide sufficient notice of a payment change or escrow change; (c) failed to provide Gritters notice for actual amounts due for insurance and taxes; and (d) failed to respond to Gritters after repeated requests; and (e) used the escrow account to pay for unauthorized fees unrelated to taxes or insurance.

153.  Servicers exercised their discretion arbitrarily, capriciously, and in a manner inconsistent with the reasonable expectations of the parties, without a proper motive.

WHEREFORE, Plaintiff DONNA GRITTERS respectfully requests that this Honorable Court to:

    a.  find that Ocwen, Nationstar, and Freddie Mac materially breached their fiduciary duties;

    b.  award Gritters her actual damages and punitive damages to be proven at trial;

    c.  award Gritters her reasonable attorney fees and costs; and

    d.  award Gritters any other relief this Honorable Court deems equitable and just.

## COUNT VII – VIOLATION OF THE TRUTH IN LENDING ACT
## (AGAINST FREDDIE MAC)

### a . Violation of § 1641

154.  In April 2012, the subject loan was sold to Freddie Mac.

155.  Neither Ocwen nor Freddie Mac provided notice of the sale or transfer of the master servicing and ownership of the debt within 30 days as required by § 1641(g).

### b.  Violation of §1666d

156.  Freddie Mac and the Servicers collected fees, costs, and charges in excess of that permitted by the mortgage contract or permitted by law resulting in a credit balance in the subject loan account in excess of $1.

157.  Gritters requested that the Servicers refund the credit balance but the Servicers refused. This resulted in unearned fees and finance charges withheld by and for the benefit of the Servicers and Freddie Mac, amounting to a violation of TILA § 1666d.

WHEREFORE, Plaintiff DONNA GRITTERS request that this Honorable Court:

   a.   grant judgment in her favor and against Freddie Mac;

   b.   declare Freddie Mac's conduct to be a violation of TILA;

   c.   award Gritters actual and additional damages pursuant to TILA § 1666d;

   d.   award Gritters reasonable attorney fees and costs pursuant to TILA § 1666d; and award any other relief this Honorable Court deems equitable and just

**Plaintiff demands trial by jury.**

Respectfully Submitted,

By: ___/s/Ross M. Zambon____

**Ross M. Zambon**
Attorney for Plaintiff

Sulaiman Law Group, Ltd.
Ross M. Zambon
ARDC # 6294149
Mara A. Baltabols
ARDC # 6299033
900 Jorie Blvd., Suite 150
Oak Brook, IL 60523
(630) 575-8181