# Exhibit A

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DONNA M. GRITTERS; | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | File No. 1:14-cv-916 |
| | ) | |
| OCWEN LOAN SERVICING, LLC; | ) | JURY TRIAL DEMANDED |
| NATIONSTAR MORTGAGE, LLC; | ) | |
| FEDERAL HOME LOAN | ) | Hon. Jorge L. Alonso |
| MORTGAGE CORPORATION; AND | ) | |
| PIERCE & ASSOCIATES, P.C.; | Defendants. | ) |
| | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, DONNA GRITTERS, by the undersigned attorneys, complains of OCWEN

LOAN SERVICING, LLC, NATIONSTAR MORTGAGE, LLC, FEDERAL HOME LOAN

MORTGAGE CORPORATION, and PIERCE & ASSOCIATES, P.C. as follows:

### NATURE OF THE ACTION

1.  Plaintiff DONNA M. GRITTERS ("Gritters") brings this action for damages from breach

of contract, breach of fiduciary duty, and violations of the Fair Debt Collection Practices Act

("FDCPA"), the Illinois Consumer Fraud Act ("ICFA"), the Real Estate Settlement Procedures

Act ("RESPA"), and the Truth in Lending Act ("TILA").

2.  All of the claims stated herein stem from the wrongful servicing, debt collection, and loss

mitigation activities related to Gritters' mortgage loan.

### JURISDICTION AND VENUE

3.  Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337

as the action arises under the laws of the United States. The Court has supplemental jurisdiction

over state law claims under 28 U.S.C. § 1367. Venue is proper in this District pursuant to 28

U.S.C. § 1391 as Gritters resides in this District and the events occurred in this District.

## PARTIES

4.   Plaintiff Gritters is a natural person who resides at 3018 182nd Place, Lansing, IL 60438 ("subject property"). The subject property is Gritters' primary residence.

5.   Defendant OCWEN LOAN SERVICING, LLC ("Ocwen") is a Florida corporation with its principal place of business in Florida. Ocwen is a foreign company in the business of servicing loans and debt collection across the country, including in the state of Illinois.

6.   Defendant NATIONSTAR MORTGAGE, LLC ("Nationstar") is a Delaware corporation with its principal place of business in Texas. Nationstar is a foreign company in the business of servicing loans and debt collection across the country, including in the state of Illinois.

7.   Defendant FEDERAL HOME LOAN MORTGAGE CORPORATION ("Freddie Mac") is a government-sponsored enterprise with its headquarters in Virginia. Freddie Mac is the purported creditor/owner of the subject loan.

8.   Defendant PIERCE & ASSOCIATES, P.C. ("Pierce") is a law firm authorized to do business in the state of Illinois. Pierce is in the business of collecting debts from Illinois residents on behalf of third-party creditors, servicers, and debt collectors.

## INTRODUCTION

9.   In 2003, Gritters executed a mortgage loan in the amount of $59,900.00 in favor of Taylor, Bean & Whitaker for the purchase of the subject property. *See* Exhibit A attached hereto is a true copy of the mortgage; *see also* Exhibit B attached hereto is a true copy of the note.

10. Ocwen filed foreclosure against Gritters on February 25, 2010 after a payment default.

11. On April 1, 2010, Gritters obtained a loan modification from Ocwen.

12. Since that date through the filing of this lawsuit, Gritters has tendered all of the monthly payments as required under the loan modification. Most months Gritters overpaid her mortgage by $25 to $150.

13. After the loan modification, Ocwen continued to treat the loan as if it were in default.

14. Ocwen failed to properly account for Gritters' payments or update its records to reflect the terms of the modification. Ocwen perpetually mishandled Gritters' escrow account, substantially overcharged Gritters for taxes and insurance, and failed to apply or manage the escrow funds in compliance with the provisions of RESPA and the mortgage contract.

15. Moreover, Ocwen failed to notify its foreclosure attorneys that a modification was in effect. Ocwen continued to charge Gritters for foreclosure fees for thirteen additional months.

16. Nationstar purchased the servicing rights from Ocwen in May 2013. Nationstar continued to treat the loan as if it were in default and continued to mishandle Gritters' escrow account.

17. Gritters made countless "Fair Debt Disputes" and sent numerous "Qualified Written Requests" to both Ocwen and Nationstar. Ocwen and Nationstar justified their conduct without any good faith basis and without conducting a reasonable investigation.

18. On October 25, 2013, Pierce sent Gritters a debt validation letter stating that it had been hired by Nationstar to commence foreclosure proceedings. On November 11, 2013, Gritters sent a letter to Pierce disputing the validity of the debt and denying the default. Pierce did not verify the debt before filing a second foreclosure against Gritters on January 22, 2014.

FACTS SUPPORTING CAUSES OF ACTION

19. The subject loan required that Gritters make monthly payments of principal, interest, and escrow for taxes and insurance. *See* Exhibit A at ¶ 2.

20. Any payments were to be allocated (a) first to pay interest due, (b) second to pay principal due, (c) third to fund the escrow account, (d) and fourth to pay any other amounts due, with any remaining amounts to reduce the principal balance. *Id.* at ¶¶ 2-3.

21. Gritters' mortgage stated that funds in the escrow account (taxes and insurance) were not to exceed the amount allowed under RESPA (the "1/6th cushion"). *Id.* at ¶ 3.

22. Any surplus in Gritters' escrow account at the end of the escrow year was to be refunded or applied in accordance with RESPA. *Id.*

**a. The First Foreclosure Case & Loan Modification**

23. Gritters defaulted on her monthly payment obligations in June 2009.

24. On August 13, 2009, Ocwen acquired the servicing rights for the subject loan.

25. On February 25, 2010, Ocwen filed a foreclosure action against Gritters.

26. In March 2010, Gritters received a loan modification offer from Ocwen as the servicer on behalf of the owner of the loan.

27. Ocwen represented to Gritters over the phone that the foreclosure action would be dismissed upon receipt of the signed modification and the initial payment. Ocwen also represented that her loan would be current and no additional fees would be owed.

28. On March 20, 2010, Gritters accepted the loan modification by signing the agreement and sending a copy to Ocwen. *See* Exhibit C attached hereto is a true copy of the loan modification.

4

29. The terms of the loan modification were as follows:

    i.    New Principal Balance of $62,691.34;

    ii.    Initial Payment of $650.26 due on 4/1/10;

    iii.    New Monthly Payments of $624.26 beginning on 5/1/10;

    iv.    5.0% fixed interest rate; and

    v.    40 year loan, maturity date: 3/1/50. *Id.*

30. The monthly payments of $624.26 were comprised of $302.30 for principal and interest, and $321.96 for escrow (taxes and insurance).

31. The loan modification increased Gritters' principal balance to $62,691.34 by adding nine payments of approximately $700.00 and an "escrow adjustment" of $1,014.26. These added payments and fees brought Gritters' loan and escrow account current. *Id.*

32. The loan modification stated:

> "You agree that the new principal balance due under your modified Note and the Mortgage will be $62,691.34. *Upon modification, your Note will become contractually current*; however fees and charges that were not included in this principal balance will be your responsibility."

> *Id.* at ¶ 1. (Emphasis added.)

33. The loan modification did not list any outstanding or accrued fees and costs. Gritters was advised that she did not owe additional fees and charges.

34. Gritters relied upon the representation that her loan was current when she accepted the modification and relied upon the representation that the foreclosure case would be dismissed.

35. Gritters made her first payment of $650.26 on March 29, 2010; the loan was modified.

36. Although the first loan modification payment was made timely, Ocwen incorrectly imputed the first payment into its computer system as being made on April 27, 2010 and imputed the effective date of the loan modification into its computer system as April 27, 2010.

37. In the intervening period between April 1, 2010 and April 27, 2010, Ocwen assessed hundreds of dollars in unearned fees and costs.

38. When Ocwen applied Gritters' payments on April 27, 2010, it deducted amounts for unearned fees and costs before applying her payments to principal, interest, and escrow.

39. Ocwen continued to treat the loan as if it were in default by applying Gritters' payments to pre-modification charges, including taxes, insurance, foreclosure fees, and costs.

40. Without sending notice to Gritters, Ocwen assessed penalties, increased Gritters' monthly payment amount, and recorded her loan as past due.

### b. Escrow April 2010 through March 2011

41. Ocwen failed to adjust Gritters' escrow account at the onset of her loan modification. Instead, Ocwen artificially increased the actual amounts owed for fees, taxes, and insurance.

42. Pursuant to the loan modification, Gritters' escrow account was fully funded and contractually current on April 1, 2010. *Id.*

43. On April 1, 2010, Gritters' escrow account had a balance of $1,571.77.[1]

44. From April 2010 to March 2011, Gritters' payments to Ocwen totaled $8,006.50. Of the $8,006.50, a total of $3,627.60 was allocated to principal and interest ($302.30 x 12 months).

45. Per the mortgage contract, the remaining $4,378.90 ($8,006.50 - $3,627.60) should have been allocated to escrow. *See* Exhibit A at ¶¶ 2-3.

46. In addition to the beginning balance of $1,571.77, the total amount allocated to escrow from April 2010 to March 2011 should have been $5,950.67 ($1,571.77 + $4,378.90).

---

[1] Based on Ocwen's own Annual Escrow Account Disclosure Statement.

47. Between April 2010 and March 2011, Gritters owed a total of $3,272.07 for real estate taxes and a total of $978.00 for insurance. The total amount actually paid from Gritters' escrow account for taxes and insurance was $4,250.07 ($3,272.07 + $978.00).[2]

48. Therefore, as of March 2011, Gritters' escrow account should have had a positive escrow balance of $1,700.70 ($5,950.67 - $4,250.07).

49. However, on March 9, 2011, Ocwen sent Gritters a notice that Ocwen had paid *$4,550.09* for her property taxes and $*1,851.00* for hazard insurance. In total, Ocwen claimed to have paid *$6,401.09* ($4,550.09 + $1,851.00) for taxes and insurance from Gritters' escrow account.

50. These numbers were artificially inflated and grossly inaccurate.[3]

51. The above notice misrepresented the actual amounts paid, and inflated Gritters' true obligations for taxes and insurance by over $2,000.00 for this time period. As a result of the inflated numbers, Ocwen assessed an escrow "shortage" of $397.15 in March 2011.

52. Ocwen attempted to charge Gritters for the $397.15 escrow "shortage" the following year by increasing her monthly payment by $33.10 over the next 12 months ($397.15 / 12 months).

53. In reality, Gritters never had an escrow "shortage" and was not in default; the amounts paid were sufficient to cover all principal, interest, and escrow (taxes and insurance).

54. Ocwen's improper accounting forced Gritters into a perpetual state of "default."

55. In March 2011, Gritters should have had an escrow balance of $1,700.70. Ocwen never returned or applied the $1,700.70 surplus in accordance with RESPA. This amount was well

---

[2] The second installment of real estate taxes for 2009 was for $1,559.58 and due by December 13, 2010. The first installment of real estate taxes for 2010 was for $1,712.49 and due by April 1, 2011.

[3] Ocwen's own payment history confirmed that a total of $1,559.58 was paid for real estate taxes in December 2010 and $1,712.49 was paid for real estate taxes in March 2011. The payment history also confirmed that $978.00 in total was paid for insurance in January 2011.

above the 1/6th annual escrow cushion allowable under RESPA. Ocwen continued to send

Gritters statements that she owed additional amounts for escrow and that she was in default.

### c. The Foreclosure Case and Gritters' "Reinstatement"

56. In April 2011, Gritters saw that her home was listed "in foreclosure" on real estate

websites. She had been told that the foreclosure case was dismissed one year prior.

57. On April 12, 2011, Ocwen sent Gritters a notice with "reinstatement" figures. The notice

claimed that Gritters owed a total of $386.92 to cure a purported default. The reinstatement

figures *included* the monthly payment due for April 2011.[4]

58. Since April's monthly payment was approximately $650.00, a reinstatement amount of

$386.92 confirmed that Gritters had overpaid her mortgage to date.[5]

59. Gritters paid the $386.92 to Ocwen on April 16, 2011.

60. On April 27, 2011, Ocwen sent a letter admitting that Gritters was current. On May 6,

2011, Ocwen dismissed the foreclosure action, thirteen months after the loan modification.

61. Ocwen continued to charge Gritters for "foreclosure fees" and deducted those amounts

from Gritters' monthly payments and escrow account. Ocwen continued to send notices stating

that Gritters was in default and that her escrow account was underfunded.

### d. Escrow April 2011 through March 2012

62. On April 1, 2011, Gritters' escrow account should have had a balance of $1,700.70.

---

[4] On April 2, 2011, Ocwen also sent a correspondence claiming $1,410.02 was due. On April 6, 2011, Ocwen sent a correspondence claiming $1,239.91 was due.

[5] Reinstatement by definition is a one-time payment to catch up on *all* the arrearages to make a loan current. By admitting that the total amount due in April 2011 was less than the scheduled April 2011 payment, Gritters was not actually behind on her loan.

63. From April 1, 2011 through March 2012, Gritters made monthly payments to Ocwen that totaled $7,321.74. Of the $7,321.74, a total of $3,627.60 was allocated to principal and interest ($302.30 x 12 months).

64. The remaining $3,694.14 ($7,321.74 - $3,627.60) should have been allocated to escrow.

65. In addition to the beginning balance of $1,700.70, the total amount allocated to escrow from April 2011 to March 2012 should have been $5,394.84 ($1,700.70 + $3,694.14).

66. Between April 2011 and March 2012, Gritters owed a total of $3,689.94 for real estate taxes and a total of $1,058.97 for insurance.[6]

67. The total amount actually paid from Gritters' escrow account for taxes and insurance from April 2011 to March 2012 was $4,748.91 ($3,689.94 + $1,058.97).

68. Therefore, as of April 2012, Gritters' escrow account should have had a positive escrow balance of $645.93 ($5,394.84 - $4,748.91).[7] However, Ocwen assessed an escrow "shortage" against Gritters in the amount of $767.40, notwithstanding the positive balance.

69. Ocwen attempted to charge Gritters for the $767.40 escrow "shortage" the following year by increasing her monthly payment by $63.95 over the next 12 months ($767.40 / 12 months).

70. In reality, Gritters never had an escrow shortage and was not in default; the amounts paid were sufficient to cover all principal, interest, and payments to escrow (taxes and insurance).

71. Ocwen never returned or applied the $645.93 surplus in accordance with RESPA.

72. Ocwen continued to send Gritters correspondence suggesting that she owed additional amounts for escrow and stating that she was in default.

---

[6] The second installment of real estate taxes for 2010 was for $1,772.95 and due by November 1, 2011. The first installment of real estate taxes for 2011 was for $1,916.99 and due by March 1, 2012.

[7] Ocwen's own payment history confirmed that a total of $1,772.95 was paid for real estate taxes in December 2011 and $1,916.99 was paid for real estate taxes in February 2012. The payment history also confirmed that a total of $1,058.97 was paid for insurance in January 2012.

### e.  Escrow April 2012 to March 2013

73. Freddie Mac obtained ownership of the subject mortgage loan in April 2012.

74. On April 1, 2012, Gritters' escrow account should have had a balance of $645.93.

75. From April 1, 2012 to March 2013, Gritters' payments to Ocwen totaled $8,360.88. Of the $8,360.88, a total of $3,627.60 was allocated to principal and interest ($302.30 x 12 months).

76. The remaining $4,733.28 ($8,360.88 - $3,627.60) should have been allocated to escrow.

77. Including the beginning balance of $645.93, the total amount allocated to escrow from April 2012 to March 2013 should have been $5,379.21 ($645.93 + $4,733.28).

78. Between April 2012 and March 2013, Gritters owed a total of $3,083.03 for real estate taxes and a total of $1,207.11 for insurance.[8]

79. The total amount actually paid from Gritters' escrow account for taxes and insurance from April 2012 to March 2013 was $4,290.14 ($3,083.03 + $1,207.11).[9]

80. Therefore, as of March 2013, Gritters' escrow account should have had a positive escrow balance of $1,089.07 ($5,379.21 - $4,290.14).

81. Ocwen never returned or applied the $1,089.07 surplus in accordance with RESPA or the mortgage contract. The amount was above the 1/6th cushion allowable under RESPA.

82. Instead, Ocwen continued to send Gritters statements suggesting that she owed additional amounts for escrow and stating that she was in default.

---

[8] The second installment of real estate taxes for 2011 was for $1,308.83 and due by August 1, 2012. The first installment of real estate taxes for 2012 was for $1,774.20 and due by March 1, 2013.

[9] Ocwen's own payment history confirmed that a total of $1,308.83 was paid for real estate taxes in July 2012 and $1,774.20 was paid for real estate taxes in February 2013. The payment history also confirmed that $1,207.11 in total was paid for insurance in January 2012.

### f. April 2013 to Present and the Transfer of Servicing to Nationstar

83. On May 16, 2013, Nationstar purchased the servicing rights from Ocwen.

84. Nationstar made its initial communication with Gritters on May 28, 2013.

85. On June 5, 2013, Nationstar sent Gritters a correspondence claiming that Gritters was in default for five (5) missed monthly payments and owed a total of $4,134.23. In short, Nationstar continued Ocwen's practices of collecting illegal charges, fees, and costs.

86. On approximately June 10, 2013, Gritters phoned Nationstar to dispute the debt. Nationstar spoke with Gritters and acknowledged her dispute.

87. Gritters was current and had continued to make her monthly payment to Nationstar each month in the amount of $760.08 to $788.64. On the date that Nationstar obtained servicing rights, Gritters should have had an escrow balance of $1,089.07.[10]

88. Notwithstanding the dispute, Nationstar continued to collect the debt and began charging Gritters $486.34 for escrow each month ($5,826.08 annually). This was more than the 1/6th cushion allowed under RESPA or the amount necessary to pay annual taxes and insurance.

### g. QWRs to Ocwen and Nationstar

89. Beginning in April 2011 through September 2013, Gritters sent numerous RESPA Qualified Written Requests ("QWRs") to Ocwen. Some of the QWRs were sent by Gritters and some were sent by the Illinois Attorney General on her behalf. Ocwen responded to each QWR by claiming that it had investigated her account and verified its own accounting as accurate.

90. Ocwen did not investigate anything in response to the QWRs. Ocwen did not address (a) its mismanagement of the escrow; (b) reasons for the monthly payment increases or the escrow "shortages;" (c) the overcharging of taxes and insurance; (d) the assessment of pre-modification

---

[10] Beginning in August 2013, Nationstar began rejecting Gritters monthly payments. Through the filing of this lawsuit, Gritters continued to tender her payment each month to Nationstar.

charges to post-modification statements; (e) withholding escrow funds in excess of the 1/6th cushion; or (f) assessing of "foreclosure charges" one year *after* the modification.

91. Instead, Ocwen advised Gritters to contact a "certified accountant" if she had "difficulty understanding" the servicing of her mortgage by Ocwen.

92. On September 6, 2013, Gritters sent a QWR to Nationstar disputing the servicing of her loan, assessment of fees, and the amount that Nationstar claimed in arrears.

93. On September 23, 2013, Nationstar responded to the QWR and stated that:

    a.   Gritters' loan had been modified in April 2010;

    b.   At the time of the servicing transfer (5/16/13) the account was due for the February 1, 2013 monthly installment;

    c.   The payment Nationstar received on July 5, 2013 was applied to March 1, 2013;

    d.   Gritters' August 2013 payment was returned to her;

    e.   On August 1, 2013, Nationstar accelerated the loan;

    f.   The account was referred to foreclosure on September 9, 2013;

    g.   Gritters' loan is contractually due for April 1, 2013; and

    h.   Freddie Mac was the owner/creditor of the subject loan.

94. In reality, Nationstar did not investigate anything in response to the QWR. Nationstar merely attached a very basic and inaccurate payment history to its response without explanation.

95. Nationstar did not address its mismanagement of escrow, reasons for the monthly payment increases, the escrow "shortages," the overcharging of taxes and insurance, or the assessment of pre-modification charges to post-modification statements.

96. Instead, the payment history established that Nationstar assessed $272.16 in late charges and *$227.50 for 22 property inspection fees in a single day.*

## CAUSES OF ACTION

97. Gritters has a valid and enforceable mortgage contract with (a) Freddie Mac as the creditor/owner of the subject loan, (b) Ocwen because the loan modification was executed between Ocwen and Gritters, and (c) Nationstar as the assignee of Ocwen (Ocwen and Nationstar collectively referred to as the "Servicers").

98. The Servicers are agents of Freddie Mac, and Freddie Mac is the principal of the Servicers. Therefore, Freddie Mac is liable for the acts and causes of action against the Servicers.

99. Gritters has suffered damages of illegal fees, charges, interest, being denied credit, remaining in a perpetual state of "default," emotional distress, mental anguish, physical illness, loss of time, and the loss of the misapplied payments. All of these damages were proximately caused by the conduct of the Defendants described herein.

100. Gritters restates each and every allegation set forth in this complaint as if fully alleged in each count of this complaint.

## COUNT I – BREACH OF CONTRACT
### (AGAINST OCWEN, NATIONSTAR, AND FREDDIE MAC)

101. Gritters fully performed her duties under the contract by tendering all monthly payments to the Servicers and by complying with all of the other terms of the contract.

102. The mortgage contract sets forth, "[i]f there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA." *See* Exhibit A at ¶ 3.

103. The Servicers breached the contract when they (a) charged and maintained deposits in Gritters' escrow account above the limits allowed by Gritters' mortgage contract or the 1/6th cushion under RESPA, (b) implemented an "escrow shortage or deficiency" without providing notice or producing documentation to substantiate the shortage prior to collection, (c) failed to

13

send notice of the escrow increase or conduct an accurate annual escrow analysis before

imposing fees to Gritters' escrow account, (d) failed to provide any notice of the escrow shortage

until *after* it had charged the amount to Gritters' account and deducted it from the escrow, and

(e) failed to refund a escrow surplus over $50.

104.  The Servicers and Freddie Mac are in further material breach of contract for their:

a.  failure to accept Gritters' mortgage payments;

b.  failure to credit and apply Gritters' payments as required by the contract;

c.  assessment of unauthorized late fees, legal fees, costs, & property inspection fees;

d.  failure to apply payments to interest and principal before escrow and fees;

e.  failure to dismiss the foreclosure action for thirteen months;

f.  filing of a second wrongful foreclosure;

g.  failure to provide accurate repayment and reinstatement figures;

h.  failure to accurately respond to Gritters' correspondence and other disputes;

i.  overcharging Gritters' escrow account for taxes and insurance;

j.  increasing monthly payments without notification to Gritters;

k.  placing the loan in "default;"

l.  converting escrow funds to unauthorized fees and costs; and

m.  failure to conduct their affairs in good faith.

WHEREFORE, Plaintiff DONNA GRITTERS respectfully requests that this Honorable

Court to:

a.  find that Ocwen, Nationstar, and Freddie Mac materially breached the mortgage contract;

b.  award Gritters her actual damages to be proven at trial;

c.  award Gritters her reasonable attorney's fees and costs; and

d.  award Gritters any other relief this Honorable Court deems equitable and just.

### COUNT II – VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
### (AGAINST OCWEN, NATIONSTAR, AND FREDDIE MAC)

105. Gritters is a "consumer" as defined by FDCPA § 1692a(3).

106. The subject debt and the unauthorized fees and costs qualify as a "debts" as defined by FDCPA § 1692a(5) as they arise out of a transaction for personal, family, or household purposes.

107. Freddie Mac and the Servicers qualify as "debt collectors" as defined by § 1692a(6) because they regularly collect debts and use the mail and/or the telephone to collect delinquent consumer accounts. The Servicers and Freddie Mac qualify as "debt collectors" because they treated the subject debt like it was in default when each acquired rights to the subject debt.

#### a. Violation of § 1692d

108. The Servicers engaged in abusive and oppressive conduct through (i) perpetual unethical mismanagement of the escrow account; (ii) perpetual refusal to refusal to correct their accounting errors or adequately respond to Gritters' repeated disputes over several years; (iii) refusal to acknowledge the express terms of the loan modification; (iv) perpetual misapplication and rejection of payments; (v) assessment of illegal fees; and (iv) a wrongful foreclosure.

#### b. Violation of §§ 1692e & f

109. The Servicers' actions were unfair, unconscionable, false and deceptive as a result of their (i) misrepresentations of the status of the debt; (ii) attempts to collect illegal fees and costs not authorized by law or the contract; (iii) misrepresentations of the amounts owed for escrow; (iv) declaring the loan in delinquent or default status when the loan modification was in effect; (v) threatening foreclosure, (vi) filing a wrongful foreclosure, (vii) assessing illegal foreclosure fees; and (viii) assessing escrow overdraft charges and improper corporate advances, fees, and costs in their dunning letters, acceleration notices, restatement letters, and payoff letters.

110.  The Servicers misrepresented the debt by lumping their attorney's fees, unauthorized fees, and costs in with the principal debt obligation.

### c.  Violation of § 1692g(a)

111.  After Nationstar initially communicated with Gritters on May 28, 2013, Nationstar was required to send Gritters a 30-day validation notice within five days.

112.  Nationstar failed to send a proper validation notice within five days of the initial communication with Gritters in violation § 1692g(a).

### d.  Violation of § 1692g(b)

113.  After Nationstar initially communicated with Gritters on May 28, 2013, Gritters disputed the debt on June 10, 2010, triggering Nationstar's duty to verify the debt or cease collection actions.

114.  After acknowledging Gritters' debt dispute, Nationstar failed to verify the debt or cease collection activities. Instead, Nationstar continued collection efforts after receiving Gritters' dispute in violation of § 1692g(b).

### e.  Violation of § 1692e(11)

115.  Ocwen's communication with Gritters on February 18, 2013 failed to identify Ocwen as a "debt collector" in violation of § 1692e(11).

116.  Nationstar's initial communications with Gritters on May 28, 2013 did not include any statement that even resembled, "that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose" in violation of § 1692e(11).

117.  Additionally, in at least five subsequent communications, Nationstar failed to identify itself as a "debt collector" in violation of § 1692e(11).

### f.  Violation of § 1692c(a)(2)

118.  After Nationstar was put on notice the Gritters was represented by an attorney,

Nationstar continued to communicate directly with Gritters on at least March 5, 2014 in violation

of § 1692c(a)(2).

WHEREFORE, Plaintiff DONNA GRITTERS requests that this Honorable Court:

    a.  enter judgment in her favor and against Ocwen, Nationstar, and Freddie Mac;

    b.  declare that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

    c.  award Gritters statutory and actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

    d.  order the deletion of all adverse credit reporting related to the loan;

    e.  award Gritters costs and reasonable attorney's fees as provided under 15 U.S.C. §1692k; and

    f.  award any other relief as this Honorable Court deems just and appropriate.

### COUNT III– VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT (AGAINST PIERCE)

119.  Pierce qualifies as a "debt collector" on behalf of Nationstar under FDCPA §§ 1692a(6)

and 1692e(2)(A).

120.  Pierce is a "debt collector" as defined by § 1692a(6) because it regularly uses the mails

and/or the telephone to collect, or attempt to collect, delinquent consumer accounts.

121.  Pierce is a "debt collector" in relation to the subject debt because it treated the debt like

it was in default when it acquired rights to the subject debt. *Id.*

### a.  Violation of § 1692g(a)

122.  After Pierce initially communicated with Gritters on September 16, 2013, Pierce was

required to send Gritters a 30-day validation notice within five days.

123.  Pierce failed to send Gritters any validation notice until October 15, 2013, in violation

of § 1692g(a).

**b.  Violation of §§ 1692g(a)(2) & 1692e**

124.  Pierce's validation notice dated October 25, 2013 stated, "The name of the current Creditor to whom the debt is owed is NATIONSTAR MORTGAGE LLC."

125.  The true name of the creditor on October 25, 2013 was Freddie Mac.

126.  Pierce's failure to identify the name of the creditor to whom the debt is owed is a violation of § 1692g(a)(2), and Pierce's false representation that the creditor was "Nationstar Mortgage LLC" on October 25, 2013 is a violation of § 1692e.

**c.  Violation of § 1692g(b)**

127.  After receipt of Pierce's validation notice on October 25, 2013, Gritters disputed the validity of the debt in writing on November 11, 2013, triggering Pierce's duty to verify the debt under § 1692g or cease collection actions until it verified the debt.

128.  Pierce failed to verify the debt or cease all collection activities after receipt of Gritters' debt dispute letter. Instead, Pierce proceeded to file for foreclosure on January 22, 2014 in violation of § 1692g(b).

129.  Pierce assessed charges against Gritters for illegal foreclosure fees after the November 11, 2013 debt dispute, without providing any verification of the debt in violation of § 1692g(b).

**d.  Violation of § 1692c(a)(2)**

130.  After Pierce was put on notice that Gritters was represented by an attorney, Pierce continued to communicate directly with Gritters on at least March 12, 2014 in violation of § 1692c(a)(2).

WHEREFORE, Plaintiff DONNA GRITTERS requests that this Honorable Court:

    a.  enter judgment in her favor and against Pierce;

    b.  declare that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

    c.  award Gritters statutory and actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

    d.  order the deletion of all adverse credit reporting related to the loan;

    e.  award Gritters costs and reasonable attorney's fees as provided under 15 U.S.C. §1692k; and

    f.  award any other relief as this Honorable Court deems just and appropriate.

### COUNT IV – VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT
### (AGAINST OCWEN, NATIONSTAR, AND FREDDIE MAC)

131.  Gritters meets the ICFA definition of "consumer." *See* 810 ILCS 505/1.

132.  The Servicers violated 815 ILCS 505/2 by engaging in unfair and deceptive acts, and by using fraud, deception, and misrepresentation in their attempts to collect a debt.

**a. Unfairness**

133.  The Servicers' conduct in relation to Gritters' loan was willful, malicious, unfair, arbitrary, and designed to place Gritters' account in a perpetual state of default.

134.  The Servicers' conduct offends public policy as it demonstrated an industry-wide practice of charging unearned fees and costs to a borrowers in order to make a profit, and to deceive borrowers into paying more than what is owed.

135.  The Servicers' actions are immoral because overcharging Gritters for unearned fees, overcharging Gritters' escrow without providing a refund, and filing a wrongful foreclosure amounts to an undue hardship to the borrower and an equally undue profit for the Servicers.

136.  The Servicers' actions caused substantial injury to Gritters and to consumers generally, as Gritters and consumers reasonably expect their contracts to be honored and their loans and escrow accounts to be properly managed and their payments properly applied.

19

137.  Gritters could not avoid these immoral undertakings because the Servicers would not accurately communicate with her in response to her phone calls, letters, and other objections.

138.  When taken as a whole over several years, the Servicers' conduct was so unethical and unending, Gritters had no choice but to submit.

### b.  Deception

139.  The Servicers' following actions were deceptive: (i) attempting to collect upon and foreclose upon a debt that was not in default; (ii) sending disclosures, statements, and notices that included unauthorized or unearned costs and fees; (iii) making material misrepresentations of fact regarding the status of the subject loan, the payment history, and the amounts actually owed for taxes and insurance; (iv) overcharging Gritters' escrow for taxes and insurance; (v) providing conflicting disclosures to Gritters; and (vi) employing communications with Gritters that were confusing and specifically designed to confuse Gritters so that she could not decipher the true status of her loan account.

### c.  Misrepresentation

140.  In addition to the above conduct, the Servicers misrepresented the amounts due so Gritters could not understand why her payments were insufficient to bring the loan "current."

141.  Gritters relied on the amounts that the Servicers stated that she owed to her detriment. Gritters relied on the terms of the loan modification and representations that the foreclosure would be dismissed.

142.  The Servicers misrepresented the effective date of the loan modification as April 27, 2010 as opposed to April 1, 2010, and misrepresented the date of Gritters' first payment.

143.  The Servicers made material misrepresentations regarding the amounts due under the loan, amounts due for escrow, and how Gritters' payments were applied.

144.  Due to the misrepresentations, Gritters was unable to determine why her payments were "insufficient" to bring the loan "current" or why she was required to overpay her escrow account.

145.  The misrepresentations, deception, and unfair practices complained of occurred in the course of conduct involving trade or commerce. Gritters relied upon the misrepresentations, deception, and unfair practices to her detriment.

146.  Punitive damages are warranted because the Servicers' conduct was outrageous, willful, wanton, and showed reckless disregard for the rights of Gritters and consumers in general.

WHEREFORE, Plaintiff DONNA GRITTERS requests that this Honorable Court:

a.  enter judgment in her favor and against Ocwen, Nationstar, and Freddie Mac;

b.  declare that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

c.  award Gritters statutory, actual, and punitive damages, in an amount to be determined at trial, for the underlying ICFA violations;

d.  award Gritters costs and reasonable attorney's fees as provided under 815 ILCS 505/10a(c); and

e.  award any other relief as this Honorable Court deems just and appropriate.

### COUNT V – VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT (AGAINST OCWEN AND NATIONSTAR)

147.  The subject loan is a "federally related mortgage" under RESPA. *See* Exhibit A.

148.  The Servicers each qualify as a "servicer" under RESPA § 2605(i)(2).

149.  While servicing the subject loan, the Servicers charged Gritters improper fees, costs, and charges not legally due under the mortgage contract or applicable law.

150.  The Servicers violated RESPA by requiring Gritters to make excessive escrow payments not based on reasonably estimated expenditures or publically available data, tax bills, or insurance bills for the subject property.

151. The Servicers failed to timely acknowledge receipt of, respond to, or conduct a reasonable investigation in response to Gritters' QWRs or requests for information and disputes regarding loan servicing in violation of RESPA § 2605(e).

152. The Servicers violated RESPA by failing to correct Gritters' account within sixty days of receiving a letter disputing the servicing in violation of RESPA § 2605(e).

153. The Servicers violated RESPA § 2605(e) by failing to acknowledge receipt of Gritters' letters disputing the application of payments, the assessment of illegal fees, and the handling of the escrow account.

154. The Servicers deducted amounts for taxes and insurance from Gritters' escrow account that were not owed, failed to make timely proper payments for taxes and insurance from the escrow account, and the funds were never returned to Gritters in violation of § 2605(g).

155. Nationstar failed to credit, treated as late, and charged a late fee for payments made to Nationstar during the 60-day transfer when it acquired the servicing rights from Ocwen on May 16, 2013 in violation of § 2605(d).

WHEREFORE, Plaintiff DONNA GRITTERS requests that this Honorable Court:

    a.  grant judgment in her favor and against Ocwen and Nationstar;

    b.  declare Ocwen and Nationstar's perpetual conduct to be a violation of RESPA;

    c.  award Gritters actual and additional damages pursuant to RESPA § 2605;

    d.  award Gritters reasonable attorney's fees and costs pursuant to RESPA § 2605(f); and

    e.  award any other relief this Honorable Court deems equitable and just.

## COUNT VI – BREACH OF FIDUCIARY DUTY
### (AGAINST OCWEN, NATIONSTAR, AND FREDDIE MAC)

156.  A fiduciary relationship existed between the Servicers and Gritters with respect to management of Gritters' escrow account.

157.  The Servicers (and therefore Freddie Mac) owed a fiduciary duty to Gritters because they were placed in a position of trust while managing Gritters' escrow account.

158.  The Servicers had a duty under the mortgage with respect to the escrow account to apply the amounts held in escrow for proper purposes only.

159.  The Servicers breached their duty by (a) using escrow funds to pay unearned fees and costs and to overpay taxes and insurance; (b) misleading Gritters as to the amount of insurance and taxes owed; (c) debiting illegal amounts from the escrow account without authorization; and (d) profiting from undisclosed fees and costs and overpayment of taxes and insurance.

160.  The Servicers and Freddie Mac failed to manage the escrow account in good faith when they (a) failed to properly account for timely payments; (b) failed to provide sufficient notice of a payment change or escrow change; (c) failed to provide Gritters notice for actual amounts due for insurance and taxes; (d) failed to respond to Gritters after repeated requests; and (e) used the escrow account to pay for unauthorized fees unrelated to taxes or insurance.

161.  The Servicers exercised their discretion arbitrarily, capriciously, and in a manner inconsistent with the reasonable expectations of the parties, without a proper motive.

WHEREFORE, Plaintiff DONNA GRITTERS respectfully requests that this Honorable Court to:

    a.  find that Ocwen, Nationstar, and Freddie Mac materially breached their fiduciary duties;

    b.  award Gritters her actual damages and punitive damages to be proven at trial;

    c.  award Gritters her reasonable attorney's fees and costs; and

    d.  award Gritters any other relief this Honorable Court deems equitable and just.

## COUNT VII – VIOLATION OF THE TRUTH IN LENDING ACT
## (AGAINST FREDDIE MAC)

### a . Violation of § 1641

162.  In April 2012, the subject loan was sold to Freddie Mac.

163.  Neither Ocwen nor Freddie Mac provided notice of the sale or transfer of the master servicing and ownership of the debt within 30 days as required by § 1641(g).

### b.  Violation of §1666d

164.  Freddie Mac and the Servicers collected fees, costs, and charges in excess of that permitted by the mortgage contract or permitted by law resulting in a credit balance in the subject loan account in excess of $1.

165.  Gritters requested that the Servicers refund the credit balance but the Servicers refused. This resulted in unearned fees and finance charges withheld by and for the benefit of the Servicers and Freddie Mac, amounting to a violation of TILA § 1666d.

WHEREFORE, Plaintiff DONNA GRITTERS request that this Honorable Court:

    a.   grant judgment in her favor and against Freddie Mac;

    b.   declare Freddie Mac's conduct to be a violation of TILA;

    c.   award Gritters actual and additional damages pursuant to TILA § 1666d;

    d.   award Gritters reasonable attorney's fees and costs pursuant to TILA § 1666d; and

    e.   award any other relief this Honorable Court deems equitable and just

**Plaintiff demands trial by jury.**

Respectfully Submitted,

By: ___/s/Ross M. Zambon_____
        **Ross M. Zambon**
        Attorney for Plaintiff

Sulaiman Law Group, Ltd.
Ross M. Zambon – ARDC # 6294149
Mara A. Baltabols – ARDC # 6299033
900 Jorie Blvd., Suite 150
Oak Brook, IL 60523
(630) 575-8181

# Exhibit
# A

This instrument was prepared by:

Name:  **Maria Armand**



Doc#:  **0334947062**
Eugene "Gene" Moore  Fee: $48.00
Cook County Recorder of Deeds
Date: 12/15/2003 08:17 AM  Pg:  1 of 18

Address:

**Taylor, Bean & Whitaker Mortgage Corp.**
**1417 North Magnolia Ave**
**Ocala, FL 34475**

After Recording Return To:
**GREATER ILLINOIS TITLE**
**930 W. 175 STREET**
**HOMEWOOD, IL  60430**



[Space Above This Line For Recording Data]

# MORTGAGE

MIN:  **100029500004818328**

DEFINITIONS  *43313 58/2 (2/3)*

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "**Security Instrument**" means this document, which is dated **December 08, 2003**                , together with all Riders to this document.

(B)  "**Borrower**" is  **DONNA M GRITTERS, As A Single Woman**

Borrower is the mortgagor under this Security Instrument.

(C)  "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D)  "**Lender**" is  **Taylor, Bean & Whitaker Mortgage Corp.**
Lender is a  **a Florida Corporation**                                        organized and existing under the laws of  **Florida**                                         . Lender's address is
**1417 North Magnolia Ave, Ocala, FL  34475**

(E)  "Note" means the promissory note signed by Borrower and dated  **December 08, 2003**                . The Note states that Borrower owes Lender **Fifty Nine Thousand Nine Hundred and no/100**
Dollars (U.S. $ **59,900.00**                ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  **January 01, 2034**

(F)  "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**ILLINOIS**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM T9808L1 (0011)—MERS                *(Page 1 of 12 pages)*

Form 3014 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax 616-791-1131



*13*

Public Record

ORDER NO.: 1301 - 004331358

ESCROW NO.: ███████████  1

STREET ADDRESS: 3018 182ND PLACE

CITY: LANSING          ZIP CODE: 60438          COUNTY: COOK

TAX NUMBER: 30-31-404-011-0000

*Exhibit "A"*

**LEGAL DESCRIPTION:**

LOT 12 IN WINTERHOFF AND SCHULTZ'S ADDITION TO LANSING, BEING A SUBDIVISION OF THE WEST 30 ACRES OF THE EAST 1/2 OF THE SOUTHEAST 1/4 OF SECTION 31, TOWNSHIP 36 NORTH, RANGE 15, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PAYLEGAL 12/99 DG

Public Record

0334947062 Page: 3 of 13

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Form 3014 1/01

ITEM T9608L2 (0011)—MERS
*(Page 2 of 12 pages)*
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

Public Record

0334947062 Page: 4 of 13

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the
**County** of **COOK**
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]
**SEE ATTACHED EXHIBIT "A"**

which currently has the address of **3018 182ND PLACE**
[Street]

**LANSING** , Illinois **60438** ("Property Address"):
[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.   **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or

Public Record

partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

   2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

   If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

   Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

   3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

   Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

   The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

**ILLINOIS**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                                             **Form 3014 1/01**

ITEM T9608L4 (0011)—MERS                                          *(Page 4 of 12 pages)*                          GREATLAND ■
                                                                                                To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.   Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.   Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly,

Public Record

Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**ILLINOIS**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM T9808L6 (0011)—MERS     *(Page 6 of 12 pages)*

Form 3014 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax 616-791-1131

Public Record

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)** Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

**(b)** Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan

Public Record

charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM T9608L9 (0011)—MERS

Form 3014 1/01

*(Page 9 of 12 pages)*

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

Public Record

an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not

Public Record

cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. **Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

Public Record

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 12 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_Donna M. Gritters_ _____(Seal)    _____(Seal)
**DONNA M GRITTERS**          -Borrower                                              -Borrower

_____(Seal)    _____(Seal)
                              -Borrower                                              -Borrower

_____(Seal)    _____(Seal)
                              -Borrower                                              -Borrower

Witness: _____    Witness: _____

State of Illinois
County of **COOK**

This instrument was acknowledged before me on    12-/9/03                    (date) by
**DONNA M GRITTERS**    A Single woman

                                                                (name[s] of person[s]).

                                                                _____
                                                                Notary Public

"OFFICIAL SEAL."
LINDA M. PERAZZOLO
Notary Public, State of Illinois
My Commission Expires 02/28/05

Public Record

# Exhibit
# B



# NOTE

December 08, 2003            **LANSING**                     **Illinois**
[Date]                        [City]                           [State]

**3018 182ND PLACE
LANSING, IL 60438**

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **59,900.00**            (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Taylor, Bean & Whitaker Mortgage Corp.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      **6.2500%.**

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    **1st**    day of each month beginning on    **February 01, 2004** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **January 01, 2034**        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **Taylor, Bean & Whitaker Mortgage Corp., 1417 North Magnolia Ave, Ocala, FL 34475**

                                       or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ **368.81**

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.



## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.0000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in

this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower has executed and acknowledges receipt of pages 1 through 3 of this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_Donna M. Gritters_____ (Seal)      _____ (Seal)
**DONNA M GRITTERS**                  -Borrower                                    -Borrower

_____ (Seal)      _____ (Seal)
                                  -Borrower                                    -Borrower

_____ (Seal)      _____ (Seal)
                                  -Borrower                                    -Borrower

Without recourse, pay to the order *[Signed Original Only]*

By: Taylor, Bean & Whitaker
Mortgage Corp.

Erla Gartor-Shaw, Vice President

# Exhibit C



Ocwen Loan Servicing, LLC
P.O. Box 24737
West Palm Beach, Florida 33416-4737
(Do not send correspondence or payments to the above address.)

WWW.OCWEN.COM

03/04/10

Donna M Gritters

3018 182nd Place
Lansing, IL 60438

Loan Number:       70605910
Property Address:   3018 182nd Place
                    Lansing, IL 60438

### PROPOSED MODIFICATION AGREEMENT

Dear Borrower(s):

Enclosed please find a proposed modification agreement (the "Agreement") on your loan referenced above for your review and consideration.

In order to accept this modification on your loan, you must complete ALL of the following steps on or before 04/01/10, ("Due Date"):

1. **SIGN** the bottom of the Agreement on the line(s) for the Borrower(s);

2. **MAIL 2** fully executed copies of the agreement to:

   Ocwen Loan Servicing, LLC
   Attention: FM Group
   1661 Worthington Road, Suite 100
   West Palm Beach, FL 33409

3. **PAY** the full initial payment in the amount of:
   Which includes your 1st new monthly payment

   $ 650.26
   [See Payment Instructions Attached]

4. **NEW MONTHLY PAYMENT:**
   Principal and Interest Payment        $302.30
   Escrow Payment                        $321.96
   Total (which may or may not include   $624.26
   escrow)                               starting on 04/01/10.

5. **SEND** proof of insurance coverage to:*
   (Send proof of insurance ONLY to Escrow
   Dept. DO NOT include the Agreement.)

   Attention: Escrow Department
   Fax: 1-888-882-1816
   E-mail:updateinsuranceinfo@ocwen.com

70605910                                                                    ENMDSFM9

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.*

**LOAN MODIFICATION AGREEMENT**

Borrower(s): Donna M Gritters

Ocwen Loan Servicing, LLC ("Ocwen") is offering you this Loan Modification Agreement ("Agreement"), dated 03/04/10, which modifies the terms of your home loan obligations as described in detail below:

A. the Mortgage, Deed of Trust, or Security Deed (the "Mortgage"), dated and recorded in the public records of Cook County, and

B. the Note, of the same date and secured by the Mortgage, which covers the real and personal property described in the Mortgage and defined therein as the "Property", located at

3018 182nd Place Lansing, IL 60438.

Pursuant to our mutual agreement to modify your Note and Mortgage and in consideration of the promises, conditions, and terms set forth below, the parties agree as follows:

1. You agree that the new principal balance due under your modified Note and the Mortgage will be $62,691.34. Upon modification, your Note will become contractually current; however fees and charges that were not included in this principal balance will be your responsibility.

2. You promise to make an initial payment in the amount of $650.26 on or before 04/01/10, after which you will commence payments of principal and interest in the amount of $302.30 beginning on 04/01/10 and continuing on the same day of each succeeding month until all amounts owed under the Note and Modification are paid in full.

3. Any payments due for taxes and insurance will be your responsibility in addition to the payments of principal and interest required under the terms of this modification. If this loan is currently escrowed Ocwen will continue to collect the required escrow amounts with your monthly principal and interest payment.

4. Upon Modification, the annual rate of interest charged on the unpaid principal balance of your loan will be 5.00000%. This rate will remain in effect until the maturity date of your loan, which is 3/1/50. This date may have been extended and may be different than your original maturity date.

5. If you sell your property, refinance or otherwise payoff your loan during the 12 months following the date of Modification, the Modification will be voidable at the sole option of Ocwen and all amounts owed under the obligations existing prior to the Modification will be due and owing.

6. You understand and agree that:

   (a) All the rights and remedies, stipulations and conditions contained in your Mortgage relating to default in the making of payments under the Mortgage will also apply to default in the making of the modified payments hereunder.

   (b) All covenants, agreements, stipulations and conditions in your Note and Mortgage will remain in full force and effect, except as herein modified and none of the your obligations or liabilities under your Note and Mortgage will be diminished or released by any provisions hereof nor will this Agreement in any way impair, diminish or affect any of Ocwen's rights under or remedies on your Note and Mortgage, whether such rights or remedies arise there under or by operation of law. Also, all rights of recourse to which Ocwen is presently entitled against any property or any other persons in any way obligated for or liable on, your Note and Mortgage are expressly reserved by Ocwen.

70695910                                                                                      FNMD2FM.9

Also, all rights of recourse to which Ocwen is presently entitled against any property or any other persons in any way obligated for or liable on, your Note and Mortgage are expressly reserved by Ocwen.

c)  Any expenses incurred in connection with the servicing of your loan but not yet charged to your account as of the date of this Agreement may be charged to your account after the date of this Agreement.

d)  Nothing in this Agreement will be understood or construed to be a satisfaction or release in whole or in part of your Note and Mortgage.

e)  You agree to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which if approved and accepted by Ocwen, will bind and inure to your heirs, executors, administrators and assigns.

f)  You understand that this agreement is legally binding and that it affects your rights. You confirm that you have had the opportunity to obtain, independent legal counsel concerning this Agreement and are signing this Agreement voluntarily and with full understanding of its contents and meaning.

g)  Corrections and Omissions: You agree to execute such other and further documents as may be reasonably necessary to consummate the transactions contemplated herein or to perfect the liens and security interests intended to secure the payment of the loan evidenced by the Note.


_____          _Donna M. Gritters_____
Ocwen Loan Servicing, LLC                 Donna M Gritters

By: _____

STATE OF _IN_____

COUNTY OF _Lake_____

The foregoing instrument was acknowledged before me this _20_ day of _March_____, 20_10_, by

only _Donna Gritters_____ (name of person(s) acknowledging).


_Alissa Finch_____
Signature of Notary

_Alissa Finch_____
Print Name of Notary

ALISSA FINCH
NOTARY SEAL
Lake County
My Commission Expires
November 2, 2013

Personally Known _____ OR Produced Identification _X____

Type of Identification Produced_ IL  Driver's license _____          *Loan Number 70605910*