**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DONNA M. GRITTERS,
     Plaintiff,

v.

OCWEN LOAN SERVICING, LLC;
NATIONSTAR MORTGAGE, LLC; and
PIERCE & ASSOCIATES, P.C.,
     Defendants.

Case No. 14 C 916

Judge Jorge L. Alonso

**MEMORANDUM OPINION AND ORDER**

For the following reasons, Defendant Pierce & Associates, P.C.'s Motion for Summary Judgment [185] is denied, Plaintiff's Motion for Summary Judgment Against Defendant Pierce & Associates, P.C., [196] is granted, Defendant Ocwen Loan Servicing, LLC's Motion for Summary Judgment [188] is granted in part and denied in part, and Plaintiff's Motion for Summary Judgment Against Defendant Ocwen Loan Servicing, LLC, [200] is granted in part and denied in part.

Before turning to the discussion, the Court notes at the outset the difficulties it encountered with the parties' presentations. First, complaint allegations are not proper support for asserted statements of fact, and to the extent any asserted fact was supported only in this way, it was not considered. Second, disputes of asserted facts supported only with arguments instead of citations to the record are also improper. Where a party failed to properly support its dispute, the asserted facts were deemed undisputed. Third, the parties' practice of citing lengthy exhibits without page or line references, and the parties' multiple mathematical errors and/or scrivener's errors unnecessarily complicated the Court's review of a significant factual record.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed. In 2003, Donna Gritters took out a mortgage loan with The Federal Home Loan Mortgage Corporation ("Freddie Mac") for her home. Ocwen Loan Servicing serviced the loan from August 2009 until May 2013. The loan was in default at the time Ocwen acquired the servicing rights, and in February 2010, Ocwen's counsel, Pierce & Associates, filed for foreclosure against Gritters. Pierce is a law firm in the business of collecting debts. Shortly thereafter, Freddie Mac approved Ocwen's request to consider a loan modification, after consideration of a breakdown of payoff funds including such items as loan principal and interest, and $500 in estimated foreclosure fees and $1,322 in estimated foreclosure expenses.

A loan modification agreement was entered into by the parties a few weeks later with an effective date of March 4, 2010. Following an initial payment by Gritters, and the entry of the agreement, her new principal balance was $62,691.34, escrow balance was $927.85, and suspense account balance was $994.04. [Pl Resp. Ocwen SOF ¶26.] When Gritters called Ocwen on April 1, 2010, it confirmed receipt of the required initial payment. Ocwen also entered notes into its loan servicing system directing Pierce to put the foreclosure action on hold. The foreclosure action was not dismissed, however, until more than a year later, on May 6, 2011,

In order to effectuate the loan modification, Ocwen made a series of credits and debits to Gritters' loan between April 6 and April 27, 2010 and the loan was brought contractually current on April 27, 2010. Ocwen sent several account statements to Gritters during this time, some with conflicting information. Among the various activities on the account that month, certain expenses incurred in filing the foreclosure action were charged to Gritters on April 6, and then

credited back on April 27 "because the foreclosure costs were included in the new principal balance under the Loan Modification." [Ocwen SOF ¶9; Pl Resp. Ocwen SOF ¶9.]

On May 21, 2010, Ocwen assessed $700 for attorneys' fees related to the foreclosure, based on an invoice it received from Pierce in April. On May 27, 2010, Ocwen received a $625 payment from Gritters. It applied $624.26 to her June 2010 payment, and $.74 towards the foreclosure attorneys' fees charge. On June 14, 2010, Ocwen made an investor suspense adjustment to the loan, applying $624.96 of the $994.04 suspense account to Gritters' July 2010 payment obligation, and the remaining $369.78 to the foreclosure attorneys' fees charge. Ocwen similarly applied certain portions of Gritters' August, September, and October 2010 payments to the attorneys' fees charge. In December 2010, Ocwen received a $48 bill for an assignment fee in conjunction with the prior foreclosure action, which it assessed to Gritters in April 2011. Pierce testified that it understood the assignment charge was not to be passed on to the borrower, but also that it was Ocwen's decision whether to do so.

Following the modification, Gritters was late in making several of her monthly payments and she missed certain payments. Gritters testified she had no knowledge of anything Ocwen did to cause her payments to be late. When she was late, Ocwen assessed late fees.

In March 2011, Ocwen projected an escrow shortage for the coming year and advised Gritters that her escrow payments and correspondingly, her monthly installments would increase. From April 2010 through March 2011, $4,250.07 was paid from Gritters' escrow account to taxes and insurance. Around April 2011, Gritters discovered that her house was still listed in foreclosure. Gritters stated in a declaration that she called Ocwen about it, and was told that her loan was current, and no foreclosure had been initiated.

Gritters also had difficulty understanding Ocwen's accounting. Between April 2010 and April 2011, Ocwen sent Gritters statements she testified she did not understand, and at least during that first month, statements that were contradictory. Gritters testified that she was confused about the loan's status, and began to suffer from anxiety and panic attacks. According to Gritters, she felt like she was in a perpetual state of default, and she feared that she would lose her home. She communicated her confusion and sought information from Ocwen both through phone calls and letters.

In the summer of 2011, Gritters reached out to the Office of the Illinois Attorney General to dispute Ocwen's handling of her account and to request assistance. Between 2011 and 2012, Gritters sent four such letters to the Illinois Attorney General's Office, which forwarded each to Ocwen. In September 2013, Gritters sent a fifth request for information to Ocwen. Although the parties dispute whether these five letters triggered response obligations under federal law and if so whether Ocwen responded adequately, it is undisputed that Ocwen responded to each.

Meanwhile, in May 2013, servicing of Gritters' account was transferred from Ocwen to Nationstar. Gritters was notified of the transfer, and informed she had been assigned a single point of contact at Nationstar. At the time of the transfer, both Ocwen and Nationstar considered the loan to be in default. On August 1, 2013, Nationstar sent Gritters a letter attempting to collect a defaulted amount of $3,345.59 by September 5, 2013. Plaintiff's attempts at partial payment were rejected by Nationstar.

In August 2013, Gritters complained to the Office of the Illinois Attorney General about Nationstar and Ocwen. In September 2013, the Attorney General's Office forwarded her letter to Nationstar for response. When Nationstar responded, it reported that it had investigated the complaint and determined that no changes to the account were warranted. On September 6,

2013, Gritters against wrote to Nationstar requesting numerous categories of information. Gritters dubbed her letter a Qualified Written Request under the Real Estate Settlement Procedures Act. Nationstar timely responded, providing a copy of the Note and Security Instrument, the May 31, 2013 servicing transfer notice, a payoff statement good through September 30, 2013, and payment history on the account from May 21, 2013 through the date of the response.

Around the same time, Nationstar retained Pierce as its foreclosure counsel. Pierce assigned the referral a new file number from the one associated with the 2010 Ocwen referral. On September 16, 2013, Pierce sent Gritters a "loss mitigation solicitation letter" on behalf of Nationstar, in which it invited her to provide Nationstar certain information to determine whether she was eligible for alternatives to foreclosure. Pierce next communicated with Gritters on October 25, 2013, when it informed her that it had been hired by Nationstar to commence foreclosure proceedings. Pierce's October 25 letter provided Gritters with the total amount of debt due on the mortgage and note, and identified Nationstar as the creditor. It also included debt validation language under § 1692 of the FDCPA. At the time, Nationstar was servicing the loan and Freddie Mac was the investor.

On November 11, 2013, Gritters' counsel sent a "Fair Debt Collection Practices Dispute Letter" to Nationstar Mortgage c/o Pierce & Associates requesting that both Nationstar and Pierce verify the debt pursuant to 15 U.S.C. § 1692g. Both Pierce and Nationstar acknowledged receipt shortly thereafter, and promised a response. On November 26, 2013, Nationstar responded to Gritters' letter, again providing a copy of the Note and Security Instrument, the May 31, 2013 servicing transfer notice, a payoff statement good through September 30, 2013, and payment history on the account from May 21, 2013 through the date of the response. Pierce

did not provide a separate response to Gritters' November 11, 2013 request, testifying instead that it had relied upon Nationstar's response.

In January 2014, Pierce filed a foreclosure complaint against Gritters in the Circuit Court of Cook County. In March 2014, Pierce sent Gritters a "Notice of Initial Case Management Conference" in the foreclosure action. This action was filed in the interim, in February 2014.

## ANALYSIS

### Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding cross-motions for summary judgment, the Court must "construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Amer. Home Assurance Co.*, 400 F.3d 523, 526 (7th Cir. 2005). The court may not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A "genuine" dispute is one that could change the outcome of the suit, and is supported by evidence sufficient to allow a reasonable jury to return a favorable verdict for the non-moving party. *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

### Pierce's Summary Judgment Motion/ Gritters' Cross-Motion

Pierce argues at the outset that Gritters fails to demonstrate a concrete particularized injury sufficient to establish Article III standing. Even if she could make such a showing, Pierce

says, summary judgment would still be appropriate because: (1) Gritters knew of her right under § 1692g to request verification of her mortgage debt, and when she did request verification, it was provided by the loan servicer as well as by Pierce; (2) any failure to disclose the identity of the holder of her mortgage was immaterial since Gritters knew it; and (3) the foreclosure case notice that Pierce forwarded to Gritters did not violate the FDCPA's prohibition against contacting a represented debtor directly since the court permitted it and it was not a communication sent in connection with the collection of a debt.

Gritters cross-moves for summary judgment against Pierce, arguing Pierce's FDCPA violations gave rise to cognizable injuries-in-fact without the need for further evidence of injury or actual damages in order to establish standing. According to Gritters, summary judgment in her favor is appropriate since there is no question of material fact that Pierce: (1) failed to send her a debt validation letter within the statutory time-frame following its initial communication with her; (2) failed to disclose the identity of the current creditor of her mortgage loan when it sent its untimely debt validation letter; (3) failed to verify her debt in response to her dispute; and (4) communicated with her directly despite knowing she was represented by counsel.

### Standing

In order to establish Article III standing, a plaintiff must establish that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S.Ct. at 1547 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting with alteration *Lujan*, 504 U.S. at 560). "A 'concrete' injury

must be '*de* facto'; that is, it must actually exist." *Id.* at 1548. "'Concrete'" is not, however, necessarily synonymous with 'tangible.'" *Id.* at 1549. "Although tangible injuries are perhaps easier to recognize, . . . intangible injuries can nevertheless be concrete." *Id.* In determining whether an intangible harm constitutes a sufficiently concrete injury, "both history and the judgment of Congress play important roles." *Id.*

In several pre-*Spokeo* FDCPA cases, the Seventh Circuit recognized standing to challenge unlawful debt collection demands even without proof of additional harm. *See, e.g., Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (standing existed based "on the debt collector's misconduct, not whether the debt is valid or . . . whether the consumer has paid an invalid debt."); *Phillips v. Asset Acceptance Corp.*, 736 F.3d 1076, 1082–83 (7th Cir. 2013) (standing existed where debt collectors had filed allegedly unlawful suits against consumers, even though consumers had not been served). *Spokeo* does not disturb these holdings. *See, e.g., Aguirre v. Absolute Resolutions Corp.*, No. 15 C 11111, 2017 WL 4280957, at *4 n. 3 (N.D. Ill. Sept. 27, 2017) (collecting cases finding Article III standing to sue for statutory damages under the FDCPA on clams of intangible injuries from allegedly predatory debt collection practices).

Since the Supreme Court's decision in *Spokeo*, the Seventh Circuit has interpreted it to mean that a statutory violation alone gives rise to a concrete harm where the "violation present[s] an appreciable risk of harm to the underlying concrete interest that Congress sought to protect by enacting the statute" at issue. *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 887 (7th Cir. 2017) (internal quotation marks omitted) (citing *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 727 (7th Cir. 2016); *Spokeo*, 136 S.Ct. at 1549-50). In those cases, the plaintiff "need not allege any *additional* harm beyond the one Congress has identified." *Spokeo*, 136 S.Ct. at 1549. Under these authorities, several district courts have found that a misrepresentation about a

debt is a sufficient injury for standing because a primary purpose of the FDCPA is to protect consumers from receiving false and misleading information about one's debts. *See, e.g., Marquez v. Weinstein, Pinson & Riley, P.S.*, No. 14 C 739, 2017 WL 4164170, at *4 (N.D. Ill. Sept. 20, 2017); *Pierre v. Midland Credit Mgmt., Inc.*, No. 16 C 2895, 2017 WL 1427070, at *1, *4 (N.D. Ill. Apr. 21, 2017). Accordingly, because Gritters had a right to receive information under the FDCPA that she claims was not provided, she alleges a concrete harm sufficient to give rise to Article III standing.

*Section 1692g(a)*

Gritters argues summary judgment should be granted in her favor because Pierce failed to provide her with a debt validation letter within five days of its September 16, 2013 letter to her in connection with its efforts to collect the debt. Pierce admits that it is a debt collector, and that it did not send the debt validation letter until October 25, 2013, but says that judgment in its favor should nevertheless be granted because its September letter was not an "initial communication" triggering disclosure obligations under the FDCPA. Pierce bases this argument both on the claim that its September letter was simply informational, and on the fact that it had previously communicated with Gritters in 2010 when she had fallen behind on her mortgage. While Gritters does not dispute the 2010 communications, she says they are irrelevant since they were years earlier and on behalf of a different client.

Within five days of its initial communication with a consumer, a debt collector must provide certain information to the consumer in what is known as a "debt validation letter." 15 U.S.C. § 1692g(a). The notice must inform the debtor of the amount of the debt and the name of the creditor to whom the debt is owed, and state that the debt will be assumed valid if the debtor does not dispute its validity within 30 days of receipt of the notice. 15 U.S.C. § 1692g(a)(1)-(3).

It must also include a statement that if the debtor disputes the debt within 30 days of the notice, the debt collector will obtain and send the debtor verification of the debt, and upon written request, send the debtor the name and address of the current creditor, if different from the original creditor. 15 U.S.C. § 1692g(a)(4)-(5). "For the FDCPA to apply, . . . two threshold criteria must be met." *Gburek v Litton Loan Serv'g., LP*, 614 F.3d 380, 384 (7th Cir. 2010). First, the defendant must qualify as a "debt collector" under the statute, and second, "the communication by the debt collector that forms the basis of the suit must have been made 'in connection with the collection of any debt.'" *Id.* at 384 (quoting 15 U.S.C. § 1692a(6), §§ 1692c(a)-(b), § 1692e, § 1692g).

Pierce argues that because its September 16, 2013, letter did not include a demand for payment, it was not sent in connection with the collection of a debt. In *Gburek*, however, the Seventh Circuit rejected such a claim, finding instead that defendant servicing company's letter offering "foreclosure alternatives" and requesting certain financial information was sent in connection with the collection of a debt, despite the fact that it had not demanded a payment. *Gburek*, 614 F.3d at 385 (there is no "categorical rule that only an explicit demand for payment will qualify as a communication made in connection with the collection of a debt."). Whether the letter contained a demand for payment, the Seventh Circuit explained, was only one factor that courts might consider in assessing whether a communication was made in connection with the collection of a debt. *Id.*; *accord Matmanivong v. Nat'l Creditors Connection, Inc.*, 79 F. Supp. 3d 864, 875 (N.D. Ill. 2015) ("The court [in *Gburek*] made clear that a debt collector need not demand payment for the FDCPA to apply.") Courts should also consider the nature of the parties' relationship, the objective purpose and context of the communication, and whether the communication was made in order to induce the debtor to settle the debt. *Id.* at 385-86.

Applying the *Gburek* factors here, Pierce's September 16, 2013 letter is a communication in connection with the collection of a debt. The only relationship Pierce had with Gritters arose out of Gritters' defaulted debt. At the time Pierce sent its letter, Gritters' loan was in default, and the letter was an invitation to settle her debt and avoid foreclosure. [Dkt 187-5 at 50.] Among other things, Pierce "strongly recommend[ed] that [Gritters] consult an attorney to preserve [her] legal rights," and invited Gritters to contact Nationstar to be evaluated for a repayment plan, loan modification, deed in lieu of foreclosure, reinstatement of her loan, or a pre-foreclosure sale. [*Id.*] Pierce's letter included the initial communication warning required under 15 U.S.C. § 1692e(11): "YOU ARE HEREBY NOTIFIED THAT THIS COMMUNICATION IS AN ATTEMPT TO COLLECT A DEBT. ALL INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE." [*Id.*][1]

Pierce tries to distinguish *Gburek* by emphasizing that, unlike the communication at issue there, its letter did not request financial information. This is not entirely so. Pierce's letter requested that Gritters complete certain documents Nationstar "may have previously sent," and provide certain information in order to be considered for foreclosure alternatives, or, if she did not have those documents, to contact Nationstar by phone in order to obtain them. [*Id.*] Just as the servicer's request for financial information in *Gburek*, Pierce's request was to initiate the process of discussing foreclosure alternatives. Viewing the purpose and context of the communication objectively, Pierce's letter is a communication in connection with an attempt to collect a debt.

Finally, Pierce argues without authority that its letter was not an "initial communication" because it had previously communicated with Gritters several years earlier on behalf of a

---

[1] The inclusion of this disclaimer "does not automatically trigger the protections of the FDCPA," but is only a factor in the Court's determination. *Gburek*, 614 F.3d at 386 n. 3.

different servicer, Ocwen, when she had previously fallen behind on her mortgage.  Standing alone, such a cursory argument could be rejected out of hand.  *See Long v. Teachers Retirement Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009) (party may waive an issue by perfunctory and undeveloped argument).  The argument, however, is rejected on its merits.  Notably, Gritters' loan was brought current in 2010 and Pierce's retention on behalf of Ocwen was terminated.  Pierce was retained in 2013 by a new client, Nationstar, opened a new file, and filed a new foreclosure lawsuit.  The fact that Pierce undertook efforts to collect on Gritters' mortgage years earlier on behalf of Ocwen cannot insulate Pierce from liability for its actions on behalf of Nationstar, especially where the first retention was successfully resolved.  To hold otherwise would suggest a major loophole in the FDCPA, inconsistent with its purpose.

It is undisputed that Pierce did not send its debt validation letter until October 25, 2013, more than a month after its initial communication.  [Pierce Resp. PSOF ¶ 15.]  Relying largely on nonbinding cases from other jurisdictions, Pierce argues that this "technical violation" should be overlooked because Gritters nevertheless knew her validation rights.  To determine whether § 1692g applies to each debt collector or only to the first debt collector to communicate with the debtor, the Court begins with the statutory language.  The language of the statute is ambiguous, referring to "the initial communication with a consumer in connection with the collection of any debt," but followed closely thereafter with "a debt collector."  15 U.S.C. § 1692g.  Given the FDCPA's remedial purpose of curbing abusive debt collection practices, this Court agrees with the trend of courts in this District that § 1692g applies to each successive debt collectors and not only to the first in line.  *See, e.g., Sanchez v. Jackson*, No. 16-CV-6144, 2016 WL 6833974 at **4-6 (N.D. Ill., Nov. 11, 2016) (collecting cases); *Janetos v. Fulton, Friedman & Gullace, LLP*,

No. 12–CV-1473, 2013 WL 791325 at *5 (N.D. Ill. March 4, 2013)[2]; *Francis v. Snyder*, 389 F. Supp. 2d 1034, 1040 (N.D. Ill. 2005) ("The requirement of providing valid disclosures under § 1692g applies to each debt collector."). Requiring successive collectors to comply with § 1692g is likewise consistent with the Federal Trade Commission's interpretation of the statute, and does not create a heavy burden on successive debt collectors. *See Sanchez*, 2016 WL 6833974 at *5; *Janetos*, 2013 WL 791325 at *5. Pierce was obliged to send a validation letter within the statutory time frame, and it is undisputed it failed to do so. Summary judgment for Gritters on this claim is granted.

Given Pierce's violation of § 1692g(a), the analysis could end here. "Statutory damages are subject to a cap of $1,000 per suit, 15 U.S.C. § 1692k(a)(2)(A), no matter how many violations of the Act a given debt collector commits." *Smith v. Greystone Alliance, LLC,* 772 F. 3d 448, 449 (7th Cir. 2014). Nevertheless, the Court will consider the other alleged FDCPA violations, as the analysis might be relevant to determining statutory damages. *See* 15 U.S.C. §1692k(b) (listing factors that should be considered in determining damages, including "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional."); *see also Matmanivong*, 79 F. Supp. 3d at 877.

According to Gritters, when Pierce finally sent its debt validation letter, its identification of Nationstar and not Freddie Mac as the creditor further violated the Act. Specifically, she says, Pierce violated § 1692g(a)(2) by falsely stating the creditor was Nationstar, and § 1692e by

---

[2] The Seventh Circuit ultimately reversed a subsequent decision of the District Court granting summary judgment to defendant on this claim, and ordered that judgment be entered for the plaintiff. *See Janetos v. Fulton, Friedman & Gullace, LLP*, 825 F.3d 317 (7th Cir. 2016). As the Court observed in *Sanchez*, however, "[I]t defies logic that the [Seventh Circuit] would grant relief for violations of § 1692g if it doubted the applicability the provision to the communication at issue." 2016 WL 6833974, at *6.

using a false, deceptive, or misleading representation in connection with its efforts to collect the debt. Pierce disagrees, arguing that any technical violation arising from its failure to name the creditor in addition to the servicer in its communication did not confuse Gritters, is not material, and is defeated by the fact that Gritters knew all along the identity of the creditor, and how to exercise her validation rights.

The Seventh Circuit's recent decision in *Janetos v. Fulton, Friedman & Gullace, LLP*, 825 F.3d 317 (7th Cir. 2016) rejects arguments similar to those which Pierce makes here. In that case, plaintiff complained that the defendant law firm's communications did not identify the current creditor Asset Acceptance, LLC, as such, but instead identified it as the "assignee" of the original creditor, and stated that the account had been "transferred" to the law firm. Finding the misrepresentation immaterial, and that the plaintiff had failed to support any claimed confusion with extrinsic evidence, the district court granted summary judgment for the law firm. The Seventh Circuit reversed with instructions to enter judgment for the plaintiff, agreeing that the letters did not clearly state who owned the debt, and holding that neither evidence of materiality nor consumer confusion were necessary to establish the § 1692g(a)(2) violation. *See id.* at 322-24 ("We decline to offer debt collectors a free pass to violate that provision on the theory that the disclosure Congress required is not important enough.") As the Court explained, "Section 1692g(a) requires debt collectors to disclose specific information, including the name of the current creditor, in certain written notices they send to consumers. If a letter fails to disclose the required information clearly, it violates the Act, without further proof of confusion." *Id.* at 319. Under this reasoning, and in accordance with the objective unsophisticated consumer standard, whether Gritters understood Nationstar's role as servicer, previously knew that Freddie Mac owned the debt, or could have figured it out despite what Pierce had written, is all beyond the

point. *See id*. at 322. "[A] lucky guess would have nothing to do with any disclosure the letters provided. Compliance with the clear requirements of § 1692g(a)(2) demands more." *Id.* at 324. By failing to clearly disclose the name of "the creditor to whom the debt is owed," Pierce's validation notice violated the Act, without any need for extrinsic evidence of confusion.

Summary judgment is likewise granted for Gritters on her § 1692(e) claim. Section 1692e provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of a debt." The Seventh Circuit recognizes three categories of § 1692e cases: (1) where the allegedly offensive language is plainly and clearly not misleading; (2) where the language is not misleading or confusing on its face, but may potentially mislead the unsophisticated consumer; and (3) where the language is plainly deceptive or misleading. *Lox v. CDA, Ltd.*, 689 F.3d 818, 822 (7th Cir. 2012). Pierce's failure to identify Gritters' creditor falls into the third category because it contained a plainly deceptive statement that is likely to mislead the unsophisticated consumer. *See Hahn v. Triumph P'ships, LLC*, 557 F.3d 755, 757-58 (7th Cir. 2009). Accordingly, there is no need for extrinsic evidence. *See Ruth v. Triumph P'ships,* 577 F.3d 790, 801 (7th Cir. 2009).

Gritters must also establish that Pierce's misstatement was material. As Pierce correctly notes, a debt collector's false statement only violates § 1692e if is material. *See Hahn*, 557 F.3d. at 757 ("Materiality is an ordinary element of any federal claim based on a false or misleading statement."). If a debt collector's false statement does not affect a consumer's ability to "choose intelligently" and the false statement would not "mislead the unsophisticated consumer," then the statement does not constitute a violation of § 1692e. *See id.* at 757-58. Here, too, the reasoning of *Janetos* is instructive. Although the Seventh Circuit rejected a materiality requirement under § 1692g(a)(2), it cautioned in dicta that this did not "suggest the required information is not

important." *Janetos*, 825 F.3d 317, 325. To the contrary, the court observed, Congress included the creditor's identity in the list of required disclosures because it had determined such information helps consumers choose intelligently. As the court explained, knowing the identity of the current creditor "potentially affects the debtor in the most basic ways." *Id.* at 325 (internal quotation and citation omitted). Because the identity of the creditor was material, and Pierce failed to provide it, its letter was plainly deceptive. Summary judgment for Gritters on this claim is granted.

*15 U.S.C. § 1692g(b)*

Pierce's October 25, 2013 validation letter advised Gritters that she had thirty days to dispute its validity and that if she did, Pierce would mail her proof of the debt. [Dkt 187-5.] It is undisputed that on November 11, 2013, Gritters' counsel requested verification of the debt from both Pierce and Nationstar in a letter sent to Pierce's office. [Pierce Resp. PSOF ¶ 20.] Specifically, her counsel directed that "[b]oth Nationstar and Pierce must verify this debt within 30 days of receipt of this letter pursuant to 15 U.S.C. § 1692g by sending written verification of the debt . . ." [*Id.*] In a letter dated November 21, 2013, Pierce acknowledged receipt of Gritters' letter, and advised, "You will receive a response in writing to the letter once we have completed all of our research and review of the file." [*Id.* ¶ 21.] Pierce did not follow up with the promised substantive response. Instead, Pierce relied on Nationstar to respond, which it did in a letter dated November 26, 2013. [*Id.* ¶ 22; Pl Resp. SOF ¶¶ 61-63, 68.] On January 22, 2014, Pierce filed a second foreclosure action against Gritters listing a default date of April 2013. [Pierce Resp. PSOF ¶ 24.]

Under 15 USC § 1692g(b), a debt collector must cease collection of a debt or any disputed portion thereof if the consumer notifies the collector in writing that she disputes the

debt within thirty days of receiving the disclosures required under § 1692g(a). According to Gritters, because Pierce failed to validate or cease collection activities in response to her dispute, it violated § 1692g(b). Pierce argues to the contrary, emphasizing that Gritters addressed her correspondence to "Nationstar Mortgage c/o Pierce & Associates, P.C.," and suggesting it was an "attempt to elicit hyper-technical violations of the FDCPA." [*See* dkt 186 at 23.] At the time the letter was sent, however, both Nationstar and Pierce were attempting to collect the debt. Gritters was entitled under the FDCPA to dispute her debt with both, and to require both to respond. *See* 15 U.S.C. § 1692g(b). Regardless of how the address was written, the letter's primary purpose was clear, and its express statements compelled both Nationstar and Pierce to respond. *See Bowse v. Portfolio Recovery Assocs., LLC*, 218 F. Supp. 3d 745, 751 (N.D. Ill. 2016) (decision to send letter to general counsel did not indicate attempt to obscure letter's contents). Pierce's argument that it could rely on Nationstar's response overlooks its own obligations to validate the debt. "A consumer's right to dispute a debt even without a valid reason is clearly conferred by the FDCPA." *Bowse*, 218 F. Supp. 3d at 752.

*16 U.S.C. § 1692c*

Finally, Gritters argues that Pierce violated § 1692c by sending her a notice of Initial Case Management Conference in the foreclosure action it had filed, despite knowing she was represented by counsel. 16 U.S.C. § 1692c(a)(2) prohibits a debt collector from communicating directly with a consumer it knows is represented by an attorney unless the attorney fails to respond within a reasonable time to a communication from the debt collector or the attorney consents to direct communication with the consumer. According to Pierce, sending the notice was not an effort to collect a debt, and meets the statutory exception for communications sent with "the express permission of a court of competent jurisdiction," 15 U.S.C. § 1692c(a).

Further, Pierce adds, any technical violation should be overlooked since the Notice asked for nothing, and only advised Gritters of the date and time for court.

Pierce's arguments notwithstanding, the notice was sent in connection with the collection of a debt, under the same reasoning of *Gburek*, 614 F.3d at 384, as discussed above. *See Gburek*, 614 F.3d at 384; *Melnarowicz v. Pierce & Assocs., P.C.*, No. 14-CV-7814, 2015 WL 4910748 at **4-5 (N.D. Ill. Aug. 17, 2015) (notice of initial case management conference was sent in connection with the collection of a debt). The context here was a foreclosure action, and the purpose of the Notice, at least in part, was to prosecute the lawsuit, "and thus, to foreclose and make good the debt." *Melnarowicz*, 2015 WL 4910748 at *5. The Notice advised of a court date in the case, and invited Gritters to look into the "Mortgage Foreclosure Mediation Program." [Pl. Resp. Pierce SOF ¶ 73 and Pierce Dep. at Exh. 20 [dkt 187-5 at 67].] Accordingly, it was an invitation to resolve a debt.

It is undisputed that at the time Pierce sent the Notice, it knew Gritters was represented by counsel with regard to the debt. Accordingly, it was prohibited from communicating with her directly. Nothing in the FDCPA limits this protection where a foreclosure action is initiated, *see Marquez*, 836 F.3d at 810-812 (noting pleadings or filings can fall within the FDCPA), and nothing required Gritters' FDCPA counsel to also represent her in the foreclosure proceeding. Further, the notice was not sent with the "express permission" of the foreclosure court as Pierce suggests. Rather, it was sent pursuant to a general order applicable in all such cases. To the extent Pierce's obligations under the FDCPA conflicted with its obligations under the Cook County order, the requirements of the FDCPA take precedence, and Pierce could have sought relief from the state court judge. *See Melnarowicz*, 2015 WL 4910748 at *5.

The Court is not persuaded by Pierce's suggestion that Gritters' *pro se* status in the foreclosure action was intended to "elicit yet another hyper-technical FCDPA violation." [Dkt 186 at 29-30.] No facts in the record support this characterization. Summary judgment for Gritters is granted on her § 1692c claim.

### Ocwen's Summary Judgment Motion/ Gritters' Cross-Motion

Gritters seeks summary judgment on her claims that Ocwen breached the loan modification agreement, and violated the FDCPA, the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*, and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605, *et seq.*, by failing to properly implement the agreement and improperly treating her loan as in default. [Dkt 200.] Ocwen cross-moves for summary judgment on each of those counts as well as on Gritters' breach of fiduciary duty claim, arguing that the undisputed evidence shows it complied with applicable law and properly handled her post-modification payments and account, by applying payments in accordance with the order of priority set out in the mortgage agreement. [Dkt 188.] Their arguments are considered in turn.

### Breach

According to Gritters, Ocwen booked the loan at a later date than it should have, and breached the loan modification agreement when it assessed $700 in foreclosure attorneys' fees since estimated fees were already a part of the loan modification's recitation of a principal balance. Specifically, she says, Ocwen breached the agreement "on at least" March 27, 2010, June 14, 2010, August 19, 2010, September 15, 2010, October 25, 2010, and April 22, 2011, by applying portions of her payments to these fees and by assessing improper late fees. [Dkt 201.] Similarly, she says, Ocwen breached the contract by assessing a $48 assignment fee charge

forwarded months after the modification was complete. For its part, Ocwen says summary judgment should be granted in its favor because Gritters shows no evidence it mishandled her account, and cites no specific contract provision it allegedly breached. In any event, it adds, Gritters cannot prevail on her claim because she breached the agreement first and failed to provide the required notice and opportunity to cure before filing the instant action.[3] [Dkt 191.]

To establish a breach of contract under Illinois law, a plaintiff must show: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages. *See McCleary v. Wells Fargo Secs., LLC*, 29 N.E.3d 1087, 1093 (Ill. App. Ct. 2015); *accord Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014). The parties do not dispute the existence of a valid and enforceable agreement, or the substance of its terms. Pursuant to the agreement, Gritters committed to pay a modified principal amount of $62,691.34, as well as "fees and charges that were not included in this principal balance." [PSOF ¶14, Exh. B ¶ 1.] The agreement further provided that "Any expense incurred in connection with the servicing of your loan but not yet charged to your account as of the date of this Agreement may be charged to your account after the date of this agreement." [*Id.* ¶ 6(c).]

Gritters supports her claim of breach with citation to Ocwen's undisputed internal records showing that the modification agreement's new principal amount was prepared with calculations including estimated foreclosure attorneys' fees and expenses of $1,822, and the undisputed fact

---

[3] Ocwen also seeks summary judgment on Gritters' contract claim to the extent it is based on breach of the covenant of good faith, or premised on allegations that Pierce failed to timely dismiss the foreclosure action. Because Gritters has not responded to these arguments, she has conceded them. *See Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) (noting general rule that "adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief"). Accordingly, Ocwen's motion is granted on these issues.

that the actual fees and expenses associated with the foreclosure were $1,582. [Ocwen Resp. PSOF ¶¶ 4, 13-15.]  Because the estimated total fees and expenses were, as Ocwen acknowledges, "ordered for purposes of calculating the modification terms," and the estimate was more than what Ocwen ultimately incurred, she says, Ocwen had no basis in the contract to charge her any more.  She further emphasizes the undisputed fact that bills for the foreclosure attorneys' fees and expenses got to Ocwen after the loan modification, and Ocwen's admission that it did not charge her for the expenses because they had already been included in the new principal balance.  [Pl Resp. Ocwen SOF ¶ 9.]  As for the $48 assignment fee, she relies on Pierce's acknowledgment that it is the type of charge not typically passed on to the borrower.

Ocwen, on the other hand, urges there can be no breach because it was specifically authorized under the above-quoted provisions of the loan modification agreement to assess the attorneys' and assignment fees since they were not included in the new principal balance. Ocwen highlights the contract language authorizing the imposition of expenses incurred but not yet charged, the fact that the invoice from its foreclosure counsel post-dates the loan modification, and the testimony of Ocwen Senior Loan Analyst Howard Handville who testified that the foreclosure attorneys' fees had not been included in the modified principal amount because they were not known to Ocwen at the time of the proposed modification.  Ocwen further points to Gritters' testimony that she read the modification and agreed to it based on its terms, and no other representations by Ocwen.  [Pl Resp Ocwen SOF ¶16.]  Ocwen adds on reply that, in any event, Gritters can establish no damage from the assessment of the $748 because at the time of loan modification Ocwen had credited her suspense balance with a $994.04 estimate for them, and the amount it later applied from her funds was substantially less.  [Dkt 218 at 2-3]. Even if this were true, Gritters says in cross-reply, Ocwen's application of suspense account

funds would still be a breach since it would conflict with the priority of payments provision set out in the original mortgage agreement. [Dkt 227 at 6.]

As the parties agree, Gritters' breach of contract claim rests in large measure on the application of the foreclosure-related charges. If the fees were included in the modification's principal balance, then Ocwen breached the contract when it charged them again and applied certain of Gritters' payments to those charges. If they were not included in the principal, on the other hand, then the loan modification agreement authorized Ocwen to charge them. According to Gritters, Ocwen's records and treatment of foreclosure costs support her version of the case. But as Ocwen points out, Handville's testimony construing those same records support its version. In the end, each side presents evidence creating a genuine issue of material fact for trial. If the jury believes Gritters' interpretation of Ocwen's records and characterization of the foreclosure fees and expenses, it could reasonably find Ocwen breached the agreement by assessing duplicative fees. If the jury believes Handville and Ocwen's explanation of the charges, and credits their interpretation of the contract, on the other hand, it could reasonably conclude that Ocwen was authorized to charge the fees that it did. Accordingly, the issue is one best left for the jury to decide.

Notably, Ocwen's belated argument about the suspense account does not change this outcome. First, Ocwen failed to timely raise this argument. *See Citizens Against Ruining The Env't v. E.P.A.*, 535 F.3d 670, 675 (7th Cir. 2008) ("[i]t is improper for a party to raise new arguments in a reply because it does not give an adversary adequate opportunity to respond."). Moreover, even if it had been properly raised, Ocwen supports its assertion only with a supplemental declaration of Ocwen Senior Loan Analyst Howard Handville in which he attests:

> [W]hen Ocwen modifies a loan that is in default, Ocwen sometimes does not received invoices from its vendors for servicing fees, such as foreclosure-related

22

> fees, until after the modification is completed. To account for such fees once they are invoiced, Ocwen credits the loan's unapplied funds balance (also known as the suspense balance) during the modification process with its estimate of the amount of the fees and then later applies from the borrowers' account toward the actual invoiced fees. . . .
>
> The Payment Reconciliation History reflects that Ocwen credited Plaintiff's suspense balance $994.04 on April 27, 2010 as part of the modification process.

[Dkt 216, Handville Suppl. Decl. ¶¶ 12, 13.] Contrary to his supplemental declaration, Handville previously testified that he did not know whether the suspense balance was for foreclosure attorneys' fees, and that he could not make the determination from Ocwen's pay history. [*See* dkt 215-1, Handville dep. at 53:11-21.] It is well settled that a party cannot use a declaration to contradict a declarant's prior deposition testimony to create a genuine dispute. *See, e.g., Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006) ("A plaintiff cannot, however, create an issue of material fact by submitting an affidavit that contradicts an earlier deposition."). Moreover, given the undisputed fact that Ocwen applied a portion of the suspense account funds to Gritters' July 2010 bill before it had come due, an issue of fact would nevertheless remain as to whether it breached the contract.

Ocwen's argument that Gritters breached the contract first also does not preclude the need for trial. As Gritters notes, Ocwen's earliest complaint of a late payment was August 2010, by which point Ocwen had already charged Gritters the disputed fees. [Ocwen SOF ¶¶ 15-19.] Further, contrary to Ocwen's assertion, *Hukic v. Aurora Loan Servs. & Ocwen Loan Serv'g.*, 588 F.3d 420 (7th Cir. 2009), does not stand for proposition that a lender is excused from its breach where the borrower fails to make a payment. *See id.* (affirming summary judgment for lender where borrower failed to provide required proof of payment of taxes and insurance such that lender was contractually authorized to also pay taxes and insurance and to charge borrower for

the same); *Catalan v. GMAC Mortgage Corp.*, 629 F.3d 676, 692 (7th Cir. 2011) (rejecting overly broad interpretation of *Hukic*). To the contrary, in *Hukic*, the Seventh Circuit specifically put to the side the parties' dispute over whether the consumer had failed to fully pay on his account, affirming summary judgment for the lender because the contract authorized it to charge the fees it had charged, regardless of whether the borrower had also failed to pay. *See Hukic*, 588 F.3d at 433. Unlike in *Hukic*, moreover, there is no alleged relationship between nonpayment by Gritters and Ocwen's authority to assess foreclosure fees.

Likewise, Ocwen's brief argument that Gritters' failed to provide the contractually required notice and opportunity to cure also does not defeat her claim as a matter of law. First, Ocwen has not established at the threshold that because it used the title "lender" in the modification agreement, there was a corresponding expansion of the definition of "lender" in the original mortgage agreement, where the notice and opportunity to cure provision is found. Second, even assuming the notice and cure provision of the mortgage agreement could apply to Ocwen, Gritters points to evidence of her multiple complaints to Ocwen about the propriety of fees it assessed prior to her filing of the instant action. [PSOF ¶¶ 61-70, Exhs. H-5 and H-9.] Whether the provision applies to Ocwen, and if so, whether Gritters complied with it, are issues to be determined another day.

The same cannot be said as for Gritters' claim that following the loan modification, Ocwen charged her late fees eighteen times at the rate of $18.44 instead of $15.12. Gritters' supports her claim with reference to the Handville's declaration in which he recites that Gritters had accrued 18 late charges of $18.44 that remained unpaid when servicing was transferred to Nationstar, although the cited records shows that Ocwen had charged the contractually correct late fee, $15.22. [Dkt 189 ¶ 74.] This misstatement was repeated in Ocwen's statement of facts.

[Dkt 190.] Ocwen explains its mistakes in reply as immaterial "scrivener's errors" in preparing its materials. [Dkt 218 at 7.] While not excusing Ocwen's carelessness in preparing its statement of facts or Handville's declaration, the underlying records show that the late fees were imposed at the contractually authorized rate of $15.12 following the loan modification, and Gritters submits no evidence to suggest otherwise. Because Gritters does not dispute that her payments were late [*see* dkt Pl Resp. SOF ¶¶ 19-30], and the contract allowed for the imposition of late fees, to the extent Gritters' claim is based on this claimed overcharge, her motion is denied and Ocwen's motion is granted.

*1692e and f* [4]

Gritters next contends that Ocwen violated the FDCPA by sending her three notices of default, dated February 22, 2013, March 29, 2013, and April 27, 2013, and a February 18, 2013 mortgage statement that misrepresented the status of the debt, sought amounts not authorized by contract or law, and threatened foreclosure if amounts were not paid by certain deadlines. Under her theory, because Ocwen misstated the amount of debt and the notices threatened foreclosure, the communications are plainly deceptive and violate the FDCPA without any extrinsic evidence of confusion. Ocwen disagrees, arguing at the outset that the FDCPA does not apply to its communications since they were not sent in connection with the collection of a debt, and in any event, are not plainly deceptive. Without extrinsic evidence of how an unsophisticated consumer would view them, Ocwen says, Gritters claim cannot withstand summary judgment.

Whether communications are made in connection with the collection of a debt under the FDCPA is determined "through the eyes of the unsophisticated consumer." *Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 645 (7th Cir. 2009) (internal quotations omitted). As

---

[4] Gritters' motion to voluntarily dismiss her §1692d claim [dkt 201 at 10 n.5] is granted.

discussed above, the Seventh Circuit has identified several factors to be considered in making such a determination, including the nature of the parties' relationship, and the objective purpose and context of the communications. *See Gburek*, 614 F.3d at 384. The parties' relationship here was that of loan servicer and consumer debtor, and the purpose of the communications was to advise Gritters of the amount she owed, and to elicit a payment from her. As Ocwen acknowledged, its notices of default, "provide[d] Gritters with an itemized list of her past due amounts and explain[ed] what she must do to cure her payment default." [Dkt 191 at 13.] Further, the February 18, 2013 mortgage statement includes a payment coupon with instructions to detach and return it "with payment in the enclosed envelope." [Dkt 189-16.] Under the rationale of *Gburek*, each of four documents were sent in connection with the collection of a debt.

Ocwen bankruptcy disclaimers do not change this analysis. Applying the unsophisticated consumer standard to similar communications, District Courts in this Circuit routinely find the sort of disclaimer Ocwen supplied here insufficient to demonstrate that the communications were not connected to the collection of a debt as a matter of law. *See Harrer v. Bayview Loan Serv'g., LLC*, No. 15-CV-4075, 2016 WL 6995559 at *2 (N.D. Ill. Nov. 30, 2016) (collecting cases). This Court agrees with the reasoning of its colleagues, especially in light of the Seventh Circuit's analysis in *Gburek* of "the commonsense inquiry of whether a communication from a debt collector is made in connection with the collection of any debt." *Gburek*, 614 F.3d at 385. As in *Harrer*, "commonsense" says that despite the disclaimer, the language in the notices of default and the mortgage statement establish that the communications were in connection with the collection of a debt.

The Court thus turns to whether the communications violated § 1692e and § 1692f by misrepresenting the status of the debt, seeking amounts not authorized by contract or law, and threatening foreclosure if amounts were not paid by certain deadlines. As discussed above, § 1692e prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." Specifically prohibited conduct includes falsely representing "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A). Section 1692f prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt." Specifically prohibited conduct includes "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

Again, when determining whether a debt collector has violated Section 1692e or f, the question is analyzed from the perspective of the "unsophisticated consumer." *Ruth,* 577 F.3d at 800; *McMillan v. Collection Professionals, Inc.*, 455 F.3d 754, 759 (7th Cir. 2006). The Seventh Circuit recognizes three categories of § 1692e cases: (1) where the allegedly offensive language is plainly and clearly not misleading; (2) where the language is not misleading or confusing on its face, but may potentially mislead the unsophisticated consumer; and (3) where the language is plainly deceptive or misleading. *Lox*, 689 F.3d at 822. When a case falls into the third category, a plaintiff may prove her case without the need for extrinsic evidence. *See Ruth*, 577 F.3d at 801. Ocwen's arguments notwithstanding, Gritters' § 1692e and f claims fall into the third category because they are premised on the claim that Ocwen misrepresented the debt. According to Gritters, because Ocwen assessed foreclosure attorneys' fees when they had already been included in the modified loan's new principal, it overstated the amount of the indebtedness.

Such a misrepresentation would be material because it could lead an unsophisticated consumer to pay more than she owed, or to act in a way she would not have otherwise. *See Lox*, 689 F.3d at 827; *Evory v. RJM Acquisitions Funding, LLC*, 505 F.3d 769, 775 (7th Cir. 2007). But for all the reasons discussed with regard to Gritters' contract claim, the amount of Gritters' debt is disputed. Accordingly, to the extent the cross motions seek summary judgment on this portion of Gritters' FDCPA claim, they are denied.

As to the reference to foreclosure litigation, however, no genuine issue of material fact remains, and summary judgment for Ocwen is granted. While the default notices informed Gritters that her failure to bring the account current could result in Ocwen's pursuit of a foreclosure, Gritters offers no evidence that Ocwen did not have a right seek foreclose at that time. To the contrary, Gritters does not dispute that during the time in which the notices were sent, she was over three months behind on her mortgage payments. [Pl Resp. Ocwen SOF ¶¶ 66-59.] A threat of litigation in itself does not violate the FDCPA; to be actionable, it must be a threat of litigation in the absence of a right to take such action. 15 U.S.C. § 1692(e); *accord Aker v. Bureaus Investment Group Portfolio, No. 15, LLC*, No. 12-CV-3633, 2014 WL 4815366 at *5, n. 7 (N.D. Ill. Sept. 29, 2014).

§ *1692e11*

Gritters' § 1692e(11) claim based on Ocwen's February 18, 2013 mortgage statement, also fails as a matter of law. Section 1692e(11) requires a debt collector to disclose in its initial communication that it is a debt collector, that it is attempting to collect a debt, and that any information obtained will be used for that purpose, and to disclose in subsequent communications that the communication is from a debt collector. It is undisputed that the challenged mortgage statement included the mandatory disclosure on its back side. Relying on

*Vaughn v. CSC Credit Servs., Inc.*, No. 93-CV-4151, 1995 WL 51402 (N.D. Ill. Feb. 3, 1995), Gritters argues that the disclosure is nevertheless vague and confusing because it is "nearly impossible to read" and buried on the back side of the document without any direction in front to read the back. *Vaughn* does not stand for the proposition that back-sided disclosures are inherently confusing to an unsophisticated consumer, nor does this Court so conclude. The issue in *Vaughn* arose from the nature of the debt collector's disclosure, not simply its placement. There, the debt collector disclosed in light gray ink that the debtor had thirty days in which to dispute the debt on the back side of a document that in plain text demanded a payment or phone call within seven days. It was the juxtaposition of two contradictory deadlines and instructions that led to the conclusion that the letter was deceptive and misleading as a matter of law. To the contrary, here, there is nothing inherently contradictory or confusing in Ocwen's disclosure, nor is it "nearly impossible to read" as Gritters says. [Dkt 201 at 14.] Rather, it tracks the statutory disclosure language, appears in the same size and darkness as the rest of the document, and is set off from surrounding text in its own text box. Under these circumstances, no reasonable factfinder could find the mortgage statement failed to include the statutory disclosure.

### ICFA

Gritters' IFCA claim also fails as a matter of law because the conduct of which she complains is either not actionable, or simply duplicates her breach of contract claim. "A breach of contractual promise, without more, is not actionable under the Consumer Fraud Act." *Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005). The ICFA is "not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy." *Greenberger v. Geico Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) (affirming dismissal of ICFA claim with prejudice where it duplicated contract claim). A consumer fraud

claim under ICFA requires "more than a garden-variety breach of contract." *Id.* (citing *Avery*, 835 N.E.2d at 844.) To establish an ICFA claim, Gritters must present evidence of "unfair or deceptive conduct [that is] distinct from the alleged breach of the contractual promise." *Greenberger*, 631 F.3d at 400. To the extent this count is premised on claims that Ocwen provided conflicting information "in every statement or collection letter," so that she "did not understand what she owed," and that it double-dipped and was "unfair" by charging her foreclosure fees she did not owe, these allegations simply restate the alleged breach. *See id.* at 399. To the extent Gritters' claim is based on Ocwen's advice that she consult with an accountant, or the claim that Ocwen falsely told her the foreclosure case was over when it had remained pending, these claims do not give rise to ICFA liability. "[I]t is not possible for a plaintiff to establish proximate cause [under the ICFA] unless the plaintiff can show that he or she was 'in some manner, deceived' by the misrepresentation." *DeBouse v. Bayer AG*, 922 N.E.2d 309, 315 (Ill. 2009). Gritters cites no evidence from which she could make such a showing.

Moreover, to the extent Gritters' claim is based on alleged misrepresentations by Ocwen about the status of the foreclosure case during an April 1, 2010 telephone call, it is beyond the statute's three-year statute of limitations. *See* 815 ILCS § 505/10a(e).[5] Further, any timely representations regarding the pendency of the foreclosure action could not support an ICFA claim. Contrary to her characterization, none of the cited communications say "the foreclosure case was over in April 2010," but rather they refer more generally to the status of foreclosure and

---

[5] Additionally, Gritters' declaration on this point conflicts with her previous deposition testimony that she did not know about the foreclosure action until about a year after the loan modification. [*See* dkt 215-3, Gritters Dep. at 51:04-13.] A declaration submitted at summary judgment contradicting an earlier deposition will not create an issue of material fact. *See Pourghoraishi*, 449 F.3d at 759.

activity on the account. It is undisputed that Ocwen considered the foreclosure status resolved upon completion of the loan modification and directed its counsel accordingly. [Pl Resp. Ocwen SOF ¶ 8.] Additionally, whether the foreclosure case remained pending was a matter of public record, and not something about which Ocwen possessed exclusive knowledge. Instead, the status of the case was "discoverable through the exercise of ordinary prudence by the plaintiff." *Randels v. Best Real Estate, Inc.*, 612 N.E.2d 984, 988 (Ill. App. 2d Dist. 1993.) Summary judgment for Ocwen on this claim is granted.

*RESPA*

Ocwen argues summary judgment on Gritters' RESPA claim is appropriate because there is no evidence it collected excessive escrow amounts or failed to refund any escrow surplus, and the record establishes it complied with RESPA's acknowledgment and response requirements. Gritters does not respond with any argument about the application of escrow funds, but argues only that she establishes a RESPA claim for Ocwen's failure to adequately respond to five Qualified Written Requests ("QWRs"), one sent by her, and four sent by the Office of the Illinois Attorney General. According to Ocwen, none of the letters constitute QWRs triggering response obligations under the statute since Gritters cannot show she controlled the Illinois Attorney General's Office and none of the letters were sent to Ocwen's designated QWR address. Even if the letters had triggered its response obligations under RESPA, Ocwen adds, it adequately responded to each.

The statute defines a QWR as "written correspondence, other than notices on a payment coupon or other payment medium supplied by the servicer," that includes certain identifying information and "includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other

information sought by the borrower."  12 U.S.C. § 2605(e).  Within 60 days of receipt of a

QWR, the servicer must take one of three actions: either (1) make appropriate corrections to the

borrower's account and notify the borrower in writing of the corrections; (2) investigate the

borrower's account and provide the borrower with a written clarification as to why the servicer

believes the borrower's account to be correct; or (3) investigate the borrower's account and either

provide the requested information or provide an explanation as to why the requested information

is unavailable.  *See* 12 U.S.C. § 2605(e)(2)(A), (B), and (C).  No matter which action the servicer

takes, the servicer must provide a name and telephone number of a representative of the servicer

who can assist the borrower.  *See id.*

Ocwen's arguments that Gritters' letters categorically failed to trigger response

obligations under RESPA fail in short order.  First, relying on a district court decision defining

agency under Illinois law, Ocwen argues there is no evidence that Gritters and the Illinois

Attorney General had a principal-agent relationship, or that Gritters could "control the Office of

the Illinois Attorney General as her agent."  [Dkt 218 at 13-14 .]  Ocwen's argument imposes

under RESPA obligations not set forth in the statute.  RESPA does not define the meaning of

agent for purposes of QWRs, *see* § 2605(e)(1); *see also* § 2602 (definitions), so the Court

interprets "agent" in accordance with its ordinary meaning.  *See Sebelius v. Cloer*, 569 U.S. 369,

376 (2013).  As the Seventh Circuit observed in *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676,

688 (7th Cir. 2011), "Any reasonably stated written request for account information can be a

qualified written request."  Indeed the Seventh Circuit had no difficulty in *Catalan* in finding

RESPA's response requirements triggered by HUD's forwarding of a borrower's complaint letter

to the defendant there.  *See id.*  Just as HUD did for the borrower in *Catalan*, the Illinois

Attorney General's Office acted on Gritters' behalf by forwarding her requests to Ocwen and

requesting responses. Notably, the record reflects Ocwen treated each request as QWRs triggering its acknowledgment and response obligations under the statute.

Second, Ocwen's assertion that its "notices – which predate the letters from the Attorney General – on the other hand are commands, rather than invitations or mere options, to use the designated address" different from that which Gritters and the Attorney General's Office employed is plainly contradicted by the record. [Dkt 218 at 15.] None of its five cited documents contain a command. Instead, each simply includes a listing of "correspondence addresses," and a request to "please address all correspondence to Ocwen Loan Servicing, LLC to the attention of the appropriate department." [*E.g.,* dkt 189-15, 190-18.] Moreover, several of the cited statements are dated *after* the Illinois Attorney General's letters. [*Id.*] "[I]t is a mind-boggling notion that the designation of an exclusive address could possibly be retroactive in effect." *McClain v. CitiMortgage, Inc.*, No. 15-CV-6944, 2016 WL 269568, at * 6 (N.D. Ill. Jan. 21, 2016).

The Court thus turns to an assessment of the parties' correspondence. Notably, Gritters does not argue that Ocwen failed to respond; she argues only that "no investigation was performed" in response to her QWRs, and that "any investigation [*sic*] reasonable investigation would have at least led to a proper credit or refund from the $496.78 in fees applied to foreclosure fees." [Dkt 201 at 23.] While this sort of unsupported allegation might survive at an earlier stage in the case, it is insufficient to survive Ocwen's summary judgment motion.

The undisputed record reflects that Ocwen provided substantive responses to each of the five QWRs. Gritters' first letter did not ask a specific question; rather, it generally disputed assessed fees, processing timing and alleged double-billing. [Dkt 202-8 at 9-10.] Ocwen responded with a copy of Gritters' payment history showing "when payments were received and

applied to the loan," and stated that "fees assessed to the loan are valid." [*Id.* at 12.] Although Gritters argues that this response did not address her inquires or explain fees, she fails to identify a specific query to which Ocwen did not respond, and it cannot be said from the face of the communications that a reasonable factfinder could find Ocwen's response deficient.[6]

Gritters' second letter raised several issues regarding her home being listed in foreclosure, duplicative fees and late fees. Ocwen responded in detail, explaining the imposition of late fees and stating that "foreclosure proceedings were stopped on April 28, 2010 after the loan was reinstated." [*Id.* at 18.] Although Gritters complains that Ocwen did not adequately respond to her request for an accounting or explanation of court fees and costs, her letter does not specifically ask for those things. [*Id.* at 14-16.]

Gritters' third letter questioned her monthly payment amount, and her suspense account. [*Id.* at 21-24.] Ocwen responded with an explanation of the payment amount and how an escrow deficiency affected it. [*Id.* at 26-27.] It also enclosed a "detailed Payment Reconciliation history." [*Id.*] Here, too, she complains that Ocwen did not address her concerns, but she fails to identify a specific issue to which it did not respond. Any such failure is not evident from the correspondence.

Gritters' only specific complaint about Ocwen's response to her fourth letter is that it "mocked Gritters by recommending the assistance of a 'certified accountant' if she still had questions. [Dkt 201 at 20.] RESPA does not provide a remedy for this issue.

Gritters' fifth letter requested information regarding application of payments, use of suspense accounts and fees attached to the account. [Dkt 202-8 at 46-48.] Ocwen responded by providing a payment reconciliation history and an explanation of its codes, as well Nationstar's

---

[6] Gritters also complains that Ocwen incorrectly stated that the foreclosure had closed, but RESPA does not provide a recovery for any such statement.

contact information since servicing of the loan by that point had been transferred there. [*Id.* at 51-53.] Once again, Gritters complains that Ocwen's response was insufficient but specifies no issue Ocwen failed to address.

Because Gritters has not demonstrated an issue of material fact supporting her claim that Ocwen failed to conduct any investigation, summary judgment for Ocwen is granted.

*Breach of Fiduciary Duty Claim*

Finally, Ocwen argues Gritters puts forward no evidence from which fiduciary liability could arise. [Dkt 191 at 21-22.] Gritters has not opposed the motion. Once a party has made a properly supported motion for summary judgment, the opposing party may not simply rest on her pleadings, but must instead submit evidence showing there is a genuine issue for trial. Accordingly, Ocwen's motion on this count it is granted.

**CONCLUSION**

For the reasons set forth above, Defendant Pierce & Associates, P.C.'s Motion for Summary Judgment [185] denied, Plaintiff's Motion for Summary Judgment Against Defendant Pierce & Associates, P.C., [196] is granted, Defendant Ocwen Loan Servicing, LLC's Motion for Summary Judgment [188] is granted in part and denied in part, and Plaintiff's Motion for Summary Judgment Against Defendant Ocwen Loan Servicing, LLC, [200] is granted in part and denied in part. A status is set for May 8, 2018 at 9:30 a.m.

Date: 4/13/2018

_____
Jorge L. Alonso
United States District Judge